**WOLVERINE INSURANCE COMPANY,**
Toy National Bank, and Loren Mahoney, Plaintiffs,

v.

**V. Lee PHILLIPS, District Director of Internal Revenue, and United States of America, Defendants.**

**Civ. No. 1015.**

United States District Court
N. D. Iowa, W. D.

Aug. 12, 1958.

Charles F. Stilwill and Kenneth T. Wilson, Sioux City, Iowa, for plaintiffs.

F. E. Van Alstine, U. S. Dist. Atty., and Theodore G. Gilinsky, Asst. U. S. Dist. Atty., for defendants.

GRAVEN, District Judge.

The controversy in this case is between a surety on the bond of a defaulting building contractor and the Government as the holder of tax liens against such contractor as to the sum of $10,168.46 being held in escrow.

On May 26, 1955, Mr. and Mrs. Loren H. Mahoney, hereinafter referred to as Owner, entered into a contract with Ericsson and Kochen, hereinafter referred to as the Contractor, relating to the construction of a residence in Sioux City, Iowa. That contract contained, among other provisions, the following:

"No. 1—*Scope of the Work*—The Contractor shall furnish all of the materials and perform all of the

work shown on the drawings and described in the specifications entitled 'Specifications of Materials and Labor Necessary and Required for the Erection and Completion of a Residence for Mr. and Mr. (sic) Loren H. Mahoney at Number 6 West 37th Street Place, Sioux City, Iowa' prepared by the Owner; and shall do everything required by this agreement the general conditions of the contract, and specifications and the drawing.

"No. 2—*Time of completion*—The work to be performed under this contract shall be commenced at once and shall be substantially completed December 1, 1955.

"No. 3—Performance bond—Performance bond in the full amount of the contract is to be furnished by the Contractor and paid for by the Owner.

"No. 4—*The contract sum*—The Owner shall pay the Contractor for the performance of the contract, subject to the additions and deductions provided therein, as follows: $30,-591.00

"No. 5—The payments shall be made in accordance with the specifications.

"No. 6—*Acceptance and final payment*—Final payment shall be due ten days after substantial completion of the work provided the work to be then fully completed and the contract fully performed. The Contractor shall furnish lien waivers on all labor and materials.

"No. 7—*The contract documents*—The conditions of the contract, the specifications and the drawings, together with this agreement, form the contract, and they are as fully a part of the contract as if hereto attached or herein repeated."

The specifications, as noted, are made a part of the contract. One paragraph of the specifications provides as follows:

"Progress Payments:

"The owner shall make payments on account the contract as provided therein, as follows: payment of one-third of the contract will be made upon completion of the basement portion of the structure. Two-thirds of the amount of the contract will be paid when the contractor is ready to begin the interior finishing of the structure and the balance due on the contract will be paid upon completion."

On July 20, 1955, the Contractor made application to the Wolverine Insurance Company for a bond. That Company will be hereinafter referred to as the Surety. In certain provisions of the application the Contractor is referred to as the Indemnitor and the Surety as the Company. Paragraph VIII of the application provides, in part, as follows:

"That the Indemnitor * * * further agrees in the event of any breach or default on his part in any of the provisions of the contract and/or bond that the said Company shall be subrogated to all the rights and properties of the Indemnitor in such contract, including deferred and reserved payments, current and earned estimates and final payments, and any and all moneys and securities that may be due and payable at the time of such default * * * or that may thereafter become due and payable on account of said contract * * *."

On July 22, 1955, the following bond was issued:

"Performance Bond

"Know All Men By These Presents:

"That Ericsson & Kochen Construction Company of Sioux City, Iowa
(Here Insert The Name and Address Or Legal Title Of The Contractor)
as Principal, hereinafter called Contractor, and Wolverine Insurance Company, a Michigan Corporation, of Battle Creek, Michigan, authorized to do business in the State of

Michigan as Surety, hereinafter called Surety, are held and firmly bound unto

Mr. and Mrs. Loren H. Mahoney of Sioux City, Iowa

(Here Insert The Name and Address Or Legal Title Of The Owner)

as Obligee, hereinafter called Owner in the amount of Thirty Thousand Five Hundred Ninety-one and ——No/100 Dollars ($30,591.00) for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents

"Whereas, Contractor has by written agreement dated May 26, 1955 entered into a contract with Owner for Constructing one family, brick construction dwelling 6 West 37th Street Place, Sioux City, Iowa in accordance with drawings and specifications prepared by Gene Bratt, Sioux City, Iowa

(Here Insert Full Name And Title)

which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

"Now, Therefore, The Condition Of This Obligation is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

"Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

"(1) Complete the Contract in accordance with its terms and conditions, or

"(2) Obtain a bid or bids for submission to Owner for completing the contract in accordance with its terms and conditions, and upon determination by Owner and Surety of the lowest responsible bidder, arrange for a contract between such bidder and Owner and make available as work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term 'balance of the contract price,' as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

"Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due.

"No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein or the heirs, executors, administrators or successors of Owner.

"Signed and sealed this 22nd day of July A.D. 1955.

"(Signatures)"

The Contractor commenced the construction of the residence in the summer of 1955. On July 26, 1955, the Owner paid the Contractor the sum of $10,305.-91 as a progress payment and on October 5, 1955, the Owner paid the Contractor the sum of $10,263 as a further progress payment. Later a number of parties filed mechanics' liens against the property. It does not appear that the progress payments were paid to those parties, except that the sum of $1,000 was paid to one of them.

On November 15, 1955, the Government made an assessment against the Contractor for federal taxes in the amount of $5,168.27. On December 15, 1955, a Government tax lien for that amount was filed in Woodbury County, Iowa.

Under the terms of the contract the residence was to be completed by December 1, 1955. At that date the residence was still incomplete. The house was finally completed and accepted by the Owner on May 24, 1956. In February 1956, while the residence was still uncompleted, there were a number of claims for materials and labor furnished for the residence which were unpaid. Starting on February 3, 1956, a large number of mechanics' liens were filed against the property. The Owner made demand upon the Surety to perform under its bond in connection with those liens. On February 12, 1956, the Government made an assessment against the Contractor for federal taxes in the amount of $2,950.64. On February 13, 1956, a Government tax lien for that amount was filed in Woodbury County, Iowa. On February 20, 1956, the Government made an assessment against the Contractor for federal taxes in the amount of $1,764.20. On February 21, 1956, a Government tax lien for that amount was filed in Woodbury County, Iowa. Three notices of levy for parts of the above taxes were duly served upon the Owner on January 24, April 23, and May 3, 1956. On February 23, 1956, the Contractor executed the following assignment to the Surety:

"ASSIGNMENT

"FOR and in consideration of the sum of One Dollar ($1.00) in hand paid by Wolverine Insurance Company of Battle Creek, Michigan, receipt whereof is hereby acknowledged, the undersigned, Frank H. Kochen and Conrad L. Ericsson, doing business under the name and style of Ericsson & Kochen Construction Co., hereby sell, assign, transfer and set over to the said Wolverine Insurance Company all of their right, title and interest in and to any balance now due them or to become due them from Mr. and Mrs. Loren H. Mahoney, pursuant to a contract entered into between the undersigned and the said Mr. and Mrs. Loren H. Mahoney for the construction of a dwelling house at 6 West 37th Street Place, Sioux City, Iowa, and the undersigned do hereby further authorize and direct the said Mr. and Mrs. Loren H. Mahoney to pay to the said Wolverine Insurance Company or its designee all monies due or to become due the undersigned under and by virtue of the building and construction work so performed by them.

"DATED this 23 day of February, 1956.

"(Signatures)"

On May 23, 1956, there were still some items of work remaining to be done on the residence which the Contractor was unable to complete. The Contractor had performed some additional work and the Owner had purchased certain items which had gone into the residence. There were mechanics' liens on file against the residence property approximating $23,000. The Owner and the Contractor then executed an agreement designated as an "Account Stated." In that agreement it is recited that there was still work to be done before the residence was completed and acceptable but that because the Contractor was unable to complete the same a deduction would be made from the contract price therefor and the residence accepted by the Owner. In that agreement an adjustment was made for extras and for some items furnished by the Owner. It then recited that the balance of the contract price remaining unpaid was the sum of $10,168.46. The agreement contains this provision:

"3. The purpose of this Account Stated is to make an accounting with regard to the construction of said dwelling house only, and does not portend to cover any matters other than a summation of the status of the work under the contract and the exchange of credits to fix the contract amount between the

parties; and it is expressly agreed that this instrument shall not be determinative of any of the rights or obligations of any third parties nor to waive any obligations on the part of the contractor to remove, eliminate or obtain waivers for all liens."

The Owner did not pay the amount referred to of $10,168.46 to the Contractor.

On June 26, 1956, the Owner, Contractor, and the Surety entered into an agreement designated as an "Escrow Agreement" relating to the $10,168.46. In it the Surety is referred to as the Company. The agreement first recites the contract between the Owner and the Contractor and the execution of the performance bond by the Company. It further recites that mechanics' liens had been filed against the Owner's property and that the Government had served notices of levy for taxes due from the Contractor. It refers to the sum of $10,-168.46 and provides that that sum be placed in escrow with the Toy National Bank subject to the determination of the rights of the Government to it and that if the Government is not entitled to it that it shall be paid to the Company. The agreement also contains the following provisions:

"1. That this Agreement shall not alter or vary the obligation of the Company or of the Contractor under the original bond and contract, including guarantee provisions contained therein, but it shall be construed to be supplementary thereto.

"2. That Owner acknowledges full and complete performance of the contract by the Contractor and Owner in accordance with the terms of contract made and entered into by the Owner and Contractor under date of May 26, 1955, save the continuing obligation of the Contractor or the Company as to liens or purported liens as hereinafter referred to.

"4. That the Company will pay or otherwise dispose of any valid and legal mechanics' liens now on file or which may hereafter be filed against the property of the Owner upon which the improvement made the subject of the contract was constructed and arising out of the contract and said construction. That it will furnish said Agent with lien waivers, receipts of payment or other sufficient evidence of final disposition of said lien. The Company may pay or dispose of any mechanics' liens or purported mechanics' liens now filed or which may hereafter be filed or may, at its option, resist and defend the foreclosure of any mechanics' liens or purported mechanics' liens now on file or which may hereafter be filed, contesting the validity or legality of the same. It shall be within the sole discretion of the Company as to whether any mechanics' liens or purported mechanics' liens shall be so contested and if any are so contested, all expense thereof shall be borne by the Company but defense may be made in the name of the Owner. The Company will pay or otherwise dispose of all such mechanics' liens, finally adjudicated to be valid and legal and a lien upon the said property of the Owner and furnish said Agent with lien waivers, receipts of payment or other sufficient evidence of final disposition of said liens."

In November, 1956, the Surety paid upon the mechanics' liens against the residence property the sum of $19,248.-02. The liens paid were correct in amount and timely filed under the Iowa law and were for labor and material furnished in connection with the residence which was the subject matter of the contract between the Owner and the Contractor. Under Code of Iowa 1958 relating to Mechanics' Liens, Chapter 572, Code of Iowa 1958, I.C.A., the holders of mechanics' liens have the right to

foreclose their liens against the property involved and have the same sold on special execution to satisfy the same. At the time the Surety paid the mechanics' lien foreclosure had not been commenced on any of them or judgment rendered thereon. The details of the Government's claim are as follows:

| Taxable Period Ending | Amount Assessed | Date of Assessment | Date Lien Filed of Record | Balance Due Not Including Interest |
|---|---|---|---|---|
| 9/30/55 | $5168.27 | 11/15/55 | 12/15/55 | $4930.92 |
| 12/31/55 | 2950.64 | 3/12/56 | 3/13/56 | 2817.34 |
| 12/31/55 | 58.65 | 11/8/56 | 12/7/56 | 58.65 |
| 1955* | 1764.20 | 3/20/56 | 3/21/56 | 676.33 |
| | | | | $8483.24 |

*Last entry relates to federal unemployment tax; all other entries above pertain to withholding & social security taxes.

On January 7, 1957, the Director served notice of levy upon the escrow agent.

On February 11, 1957, the Surety, the Escrow Agent Bank, and the Owner commenced the present action. The relief asked is that it be determined that the rights of the Surety to the funds held in escrow are superior to that of the Government and that the levies made by the defendant District Director be quashed.

The original defendants named in the complaint were Frank M. Halpin, the local District Director of Internal Revenue and the United States of America. The parties subsequently stipulated that the current District Director is V. Lee Phillips and that he should be substituted in place of the original defendant Director Halpin.

On October 10, 1957, the Government filed an answer and counterclaim. In its answer and counterclaim it asserts that the Contractors are indebted to it for federal taxes in the sum of $9,991.44 with interest thereon from October 10, 1957. The sum of $9,991.44 includes principle of the taxes in the sum of $8,-483.24 with interest to October 10, 1957. The claim of the Government with accrued interest now exceeds the amount held in escrow.

It is the claim of the Government that it is entitled to the escrow fund by virtue of its tax liens for the taxes due from the Contractor. The Government bases its claim to that fund under the tax lien statute. Section 6321, Title 26, United States Code (Section 3670, Internal Revenue Code of 1939, 26 U.S.C. § 3670). It does not base its claim on the priority statute. Section 191, Title 31, United States Code, Annotated.

The parties in their briefs and arguments have pretty well encompassed the larger part of the field of law relating to federal tax liens.

At the outset the Government challenges the right of the Surety to assert any claim because of the mechanics' liens paid by it. It asserts the Surety made such payments as a volunteer. In that connection the Government discusses the difference between "performance bond" and a "payment bond." The Government then asserts that the bond in question was a "performance bond" and not a "payment bond." It further asserts that since the house of the Owner was accepted by him as completed the bond had fulfilled its function to the Owner and that the Surety was under no obligation to make payment to the unpaid mechanics' lienholders and that in making such payments the Surety acted as

a "mere volunteer." In connection with its claim that in making payment to the unpaid materialmen the Surety acted as a "mere volunteer" the Government cites and relies upon the case Bourrett v. W. M. Bride Construction Co., 1957, 248 Iowa 1080, 84 N.W.2d 4. In that case it was held that an unpaid subcontractor could not recover against the surety on a private building bond given by the principal contractor. The Iowa Supreme Court in the recent case Rowe v. Stufflebeam, Iowa 1958, 89 N.W.2d 875, refers to the holding in the Bourrett case as follows (at page 879):

"It holds merely that where a building bond runs only to a named owner and undertakes no more than to indemnify him against breaches of the contract no one else may recover on the bond, especially where it contains an express provision limiting its benefits or right of action thereon to the owner and he has sustained no loss, in the legal sense, by the contractor's breach of the contract."

See also Hopper Bros. Quarries v. Merchants Mutual Bonding Company, 8 Cir., 1958, 255 F.2d 147.

The contract involved in the Bourrett case, like the contract in the present case, contained a provision that the contractor should furnish all materials and perform all labor. In the Bourrett case the Iowa Supreme Court held that such provision "is not equivalent to a promise by the contractor to pay for labor and materials." [248 Iowa 1080, 84 N.W.2d 7.] The bond involved in the Bourrett case, like the bond in the present case, expressly limits its provisions to the benefit of the obligee owner only. However, the contract in the present case, unlike the contract involved in the Bourrett case, contains a provision providing· that the Contractors are to furnish the Owner with waivers of mechanics' liens for materials and labor. Such a provision or a similar provision would not permit those furnishing materials or labor for a building to sue on the bond.

Section 166 of the Restatement of the Law of Security is as follows:

"Where a surety guarantees the performance of a contract by a contractor who does not promise the owner to pay those furnishing labor or materials but agrees to complete the work free of liens or to furnish labor and materials, laborers and materialmen have no rights against the surety."

However, the fact that materialmen or laborers cannot sue or recover on the bond does not mean that the surety is not under obligation to the building owner to pay materialmen and laborers. The materialmen and laborers may nevertheless be "incidental beneficiaries" who will benefit by the performance by the surety of its obligation to the building owner, although without standing to sue the surety directly on the bond. See Sections 133, 147, Restatement of Law of Contracts. Such would seem to be the situation in the present case. In the building contract in the present case it is provided "The Contractor shall furnish lien waivers on all labor and materials." The bond in the present case provides:

" * * * The Condition of This Obligation is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect."

When the Contractor allowed mechanics' liens to be filed against the Owner's property, it would seem that it was not "promptly and faithfully" performing the provision of the contract on its part to be performed relating to the furnishing of lien waivers. The failure of the Contractor to keep the property free from mechanics' liens constituted a material breach of the contract, for if the liens were not paid the lienholders could foreclose them and the property would be lost to the Owner. If the liens were not paid the damages sustained by the Owner by such failure would be the amount of the valid liens. The Con-

tractor and the Surety would be liable to the Owner for such damages. The fact that the Owner's damages were made up of identifiable items owing to specific parties and that the Surety upon the request of the Owner paid those items direct to such parties would not change the legal situation. That situation was that the lienholders were not paid because of any rights they had under the bond but were paid because of the Owner's rights under the bond. Under the provisions of the bond, upon default of the Contractor, the Surety had the right to "remedy the default." It remedied the default by paying the amount of the liens which amount also constituted the amount of Owner's damages for such default.

The Government urges that although the bond is denominated a "Performance Bond," it is only "concerned with actual construction" and does not obligate the Surety for any breaches of the construction contract that do not relate to the actual construction. The theory of the Government is that Contractors did actually construct the structure in accordance with the plans and specifications therefor and that such being the case the Surety was under no further obligation.

The case of Closson v. Billman, 1904, 161 Ind. 610, 69 N.E. 449, was an action against the surety on a residence building contract bond. The contract provided that the contractor was to build, construct, and complete the residence. In the present case the contract provided that the Contractor should "furnish all of the materials and perform all work" for the residence. In the Indiana case referred to, the contractor completed the construction of the residence specified in the contract but did not pay for some of the materials, and mechanics' liens were filed against the owner's residence. When sued upon the bond the surety contended that there was no liability on his part because the owner did receive a residence constructed in accordance with the plans and specifications therefor. The Supreme Court of Indiana rejected that contention, stating (at page 451 of 69 N.E.):

"To hold, in the face of the bond and contract, that the construction and completion of the building in accordance with the plans and specifications was a compliance with the bond, although the owner would be compelled to pay out large sums, in excess of the amount stipulated in the contract, to discharge liens for the purchase price of materials, would be to keep the word of promise to the ear but break it to the hope."

See also Saint Paul Mercury Indemnity Company v. Wright Contracting Company, 4 Cir., 1958, 250 F.2d 758.

In connection with its contention on this phase of the case, the Government cites the case of United States v. Munsey Trust Co., 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022. That case involved a controversy between the United States and a surety on payment bonds given to secure the payment of materialmen and laborers in connection with contracts for the painting and repairing of certain federal buildings as to the percentages retained by the United States. The United States prevailed. In the opinion it is stated that the United States was only concerned as to completion of the work since it was not under any liability to the materialmen and laborers and its buildings were not subject to liens in favor of them. In the present case the property of the Owner was subject to such liens and the Owner was subject to losing his property because of them. In 72 C.J.S. Principal and Surety § 309 p. 768, it is stated:

"Whatever present liability on the part of a surety exists * * * may be paid off and satisfied by him without waiting to be coerced by process, and such payment will entitle him to reimbursement from his principal; a payment by a surety cannot be voluntary as long as the obligation is enforceable."

In 92 C.J.S. Volunteer p. 1032, it is stated:

"In a general sense a 'volunteer' is one who does or undertakes to do that which he is not legally or morally bound to do, and which is not in pursuance or protection of any interest; one who intrudes himself into matters which do not concern him."

It is the holding of the Court that the Surety in the present case was under a legally enforceable liability in connection with the mechanics' liens.

Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. § 6321 (Section 3670 Internal Revenue Code of 1939, 26 U.S.C. § 3670) makes a federal tax lien a lien "upon all property and rights to property, whether real or personal," belonging to the taxpayer. It attaches to all property and rights to property which are subject to ownership and which can be transferred and which can be brought under the dominion of a court by its usual processes; it attaches not only to land and tangible personal property but also to claims, demands, and causes of action which the taxpayer can assert against third persons, including bank deposits, claims for wages and actions for breach of contract. United States v. Barndollar & Crosbie, 10 Cir., 1948, 166 F.2d 793; Citizens State Bank v. Vidal, 10 Cir., 1940, 114 F.2d 380, 382, 383; Bank of Nevada v. United States, 9 Cir., 1958, 251 F.2d 820, certiorari denied, 1958, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813. See also cases cited in Beeghly v. Wilson, D.C.1957, 152 F.Supp. 726, 729, 730.

In the field of personal injury there are what are sometimes referred to as the "two wicked sisters"—contributory negligence and assumption of risk. In the field of federal tax law, holders of non-federal liens which compete with federal tax claims encounter what are to them two "wicked sisters." Those two wicked sisters being "specific" and "perfected."

 In order that a non-federal lien may be given priority over a federal tax claim, it must in addition to being prior in time be specific and perfected. In order to be specific it must be definite as to amount, the lienor and the property subject thereto. United States v. City of New Britain, 1954, 347 U.S. 81, 86, 74 S.Ct. 367, 98 L.Ed. 520. In addition to being specific the non-federal lien must also be perfected. United States v. City of New Britain, supra. If such lien meets the United States Supreme Court tests of specificity and perfectedness, it will be deemed to be a choate lien and will be given precedence as to federal tax claims in the order of time. United States v. City of New Britain, supra. A non-federal lien which does not meet the United States Supreme Court tests of specificity and perfectedness is an inchoate lien and it will not be given priority over a federal tax lien even though prior in time to the latter. Just what is required in order for a specific lien to be a perfected lien under the more recent holdings of the United States Supreme Court is not entirely clear. So far only a portion of one competing non-federal lien has been held to meet the tests of that Court in regard to being perfected. A portion of the competing non-federal tax liens involved in the case of United States v. City of New Britain, supra, was regarded as meeting that test. In the recent case of United States v. Latrobe Construction Co., 8 Cir., 1957, 246 F.2d 357, certiorari denied, 355 U.S. 890, 78 S.Ct. 262, 2 L.Ed.2d 189, the United States Court of Appeals for this Circuit held that a federal lien will prevail over any competing lien which is not specific and perfected. In that case the federal lien was a real estate mortgage lien. In the cases of Mason City & Clear Lake R. Co. v. Imperial Seed Co., D.C.1957, 152 F.Supp. 145, Beeghly v. Wilson, D.C.1957, 152 F.Supp. 726, and Noltze Motor Co. v. Burrows-Moore Pontiac, Inc., D.C., 1958, 157 F.Supp. 593, this Court discussed certain phases of federal tax claims. In the first case this Court (152 F. Supp. at pages 152–154) referred to an article by Harold L. Reeve entitled "The Relative Priority of Government

and Private Liens," 29 Rocky Mountain Law Review 167 (February 1957). In that aritcle it was stated that during the ten years preceding twelve cases involving the priority of federal tax claims had come before the United States Supreme Court and that the Government had won all twelve cases. The Government's unbroken string of victories in such cases has been extended to fifteen.

In the case of United States v. Vorreiter, 1957, 355 U.S. 15, 78 S.Ct. 19, 2 L.Ed.2d 23, the Court reversed Per Curiam the holding of the Colorado Supreme Court, 1957, 134 Colo. 543, 307 P.2d 475. That case involved priority as between a mechanics' lien valid under the state law and a subsequently arising federal tax lien. The Colorado Supreme Court had given priority to the mechanics' lien. The Per Curiam opinion of the United States Supreme Court was as follows:

"The petition for writ of certiorari is granted. The judgment of the Supreme Court of Colorado is reversed. United States v. Security Trust & Savings Bank, 340 U.S. 47 [71 S.Ct. 111, 95 L.Ed. 53]"

It is of interest that the United States Supreme Court cited in support of the reversal the case of United States v. Security Trust & Savings Bank which involved an attachment lien rather than the cases of United States v. White Bear Brewing Co., 1956, 350 U.S. 1010, 76 S. Ct. 646, 100 L.Ed. 871, and United States v. Colotta, 1955, 350 U.S. 808, 76 S.Ct. 82, 100 L.Ed. 725, reversing United States v. Colotta, 1955, 224 Miss. 33, 79 So.2d 474, which involved mechanics' liens. The concurring opinion of the Chief Justice of the Colorado Supreme Court in the Vorreiter case contains some rather fiery language as to the treatment being afforded mechanics' liens by the United States Supreme Court. On remand of the Colotta case to the Mississippi Supreme Court, three of its members also used some very fiery language in regard to the same matter.

See United States v. Colotta, 1956, 224 Miss. 33, 86 So.2d 19, 21.

The next case in which the Government was successful before the United States Supreme Court is the case United States v. R. F. Ball Construction Co., Inc., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510, in which it was held that the Government's tax lien was prior to the claim of a surety on certain construction bonds. That case will be later referred to.

The next case in which the Government was successful was in the case of United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135. In that case the Government's tax lien prevailed as to the surrender value of life insurance policies of a deceased delinquent taxpayer.

It might seem as though the Government's winning streak was broken by the decision in the case of Commissioner of Internal Revenue v. Stern, 1958, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126, since the Government in that case was unsuccessful in its attempt to impose liability upon the surrender value and the other proceeds of life insurance policies of a deceased delinquent taxpayer. However, it should be noted that in that case the claim of the Government was based upon the section of the Internal Revenue Code relating to the transferees. Section 6901, Internal Revenue Code of 1954, 26 U.S.C. § 6901 (Section 311 of the Internal Revenue Code of 1939, 26 U.S.C. § 311). It did not involve either the tax lien statute or the priority statute.

There have been a number of articles, notes, and comments on the subject of tax claims of the United States. Kennedy, The Relative Priority Of The Federal Government: The Pernicious Career Of The Inchoate And General Lien, 63 Yale Law Journal 905 (May 1954); Plumb, Federal Tax Collection and Lien Problems, 13 Tax Law Review 247 (March 1958) and 13 Tax Law Review 459 (May 1958); Anderson, Federal Tax Liens—Their Nature and Priority, 41 California Law Review 241 (Summer 1953); Reeve, The Relative

Priority of Government and Private Liens, 29 Rocky Mountain Law Review 167 (February 1957); Kerrigan, The Surety As Competing Claimant To Contract Funds, 24 Insurance Counsel Journal 34 (January 1957); Cross, Federal Tax Claims: The Contractor's Surety and Suppliers, 24 Insurance Counsel Journal 384 (October 1957); Witherspoon, Surety's Salvage and Subrogation, 25 Insurance Counsel Journal 168 (April 1958); Prather, Federal Liens As They Affect Mortgage Lending, 13 The Business Lawyer 118 (November 1957); Anderson, Wages And Taxes—A Surety's Headache, 5 Hastings Law Journal 144 (1954); Note, Priority As Between The Federal Tax Lien and The Mechanic's Lien, 25 Fordham Law Review 100 (Spring 1956); Note, Effect Of A Federal Tax Lien On A Bank Deposit, 42 Iowa Law Review 412 (1957); Comment, Priority Of A Subsequent Federal Tax Lien Over An Antecedent Inchoate Lien, 54 Michigan Law Review 829 (1956); Comment, 41 Minnesota Law Review 833 (1957). See 1957 Proceedings of the Section of Real Property Probate and Trust Law of the American Bar Association, pp. 89–96.

 It is well settled that an unforeclosed mechanics' lien even though filed prior to a Government tax lien will be denied priority because it is not a perfected lien. United States v. White Bear Brewing Co., supra; United States v. Vorreiter, supra. It is also well settled that a tax lien which is filed subsequent to the date of an attachment lien but prior to the date the attaching creditor obtains judgment is entitled to priority. United States v. Acri, 1955, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264; United States v. Security Trust & Savings Bank, supra. The doctrine of cases cited is that a non-federal lien which is not perfected at the time the Government tax lien arises cannot obtain priority over such tax lien on the theory of relation back.

In cases involving a surety on a bond of a defaulting contractor, the legal situation may be quite complex. The surety may have rights as a subrogee of those supplying materials and labor for the project. It may have rights as a subrogee of the contractor. It may have rights as a subrogee of the owner. It may have rights as the holder of an equitable lien either with or without relation back. It may have rights as an assignee. It may have rights as a chattel mortgage holder. It may also have contractual rights not encompassed within the foregoing categories. Where the claim of the surety is in conflict with a federal tax lien there is frequently involved questions as to nature and extent of such a lien.

In the case of Colusa-Glenn Production Credit Ass'n v. Phoenix Ins. Co., D.C. 1956, 145 F.Supp. 844, which involved the question of priority between a Government tax lien and a surety on a construction, the Court pointed out (at page 848) that it was necessary to distinguish between the various equitable doctrines that might be involved in such a situation.

In the case of United States v. Munsey Trust Co., 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, there was involved the claim of a surety on a construction bond to certain retained percentages. The Court stated (332 U.S. at page 239, 67 S.Ct. at page 1601):

"In these cases, it is usual for the rights relied upon to be largely derivative or subrogated ones. Decision will be attended with unnecessary confusion and difficulty if it is not clear whose rights are being asserted and who claims them."

In 33 Am.Jur., p. 427, an equitable lien is defined as follows:

"An equitable lien is a right, not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts. It is not an estate or property in the thing itself, nor is it a right to recover the thing, that is, it is not a right which may be the basis of a possessory action, but it is

merely a charge upon it. Such a lien may be created by an express contract which shows an intention to charge some particular property with a debt or obligation, or it may arise by implication from the relations and dealings of the parties whose interests are involved. * *

In Restatement, Law of Restitution, Sec. 161, p. 650, it is stated:

"Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises."

Subrogation involves the substitution of one party to the rights and remedies of another party. Belknap Hardware & Mfg. Co. v. Ohio River Contract Co., 6 Cir., 1921, 271 F. 144, 146. There is a distinction between subrogation and assignment. Restatement, Restitution, Section 162(h), p. 660. An assignment may give the assignee the status of a mortgagee. It may also give rise to an equitable lien. While subrogation and equitable liens both came from the Court of Chancery, they are not judicial Siamese twins. A party may be a subrogee without being the holder of an equitable lien and vice versa. A party may also be regarded as being both a subrogee and the holder of an equitable lien. In order to work out equity courts will relate an equitable lien back to the inception of the relationship between the parties. Some courts in order to work out equity will similarly relate subrogation back to the inception of the relationship between the parties. National Surety Co. v. Berggren, 1914, 126 Minn. 188, 148 N.W. 55.

A surety on the bond of a defaulting contractor may make claim to withheld funds on the theory that it has the status of a chattel mortgagee in relation thereto. See United States v. R. F. Ball Construction Co., Inc., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510. Section 6323 of the Internal Revenue Code, 26 U.S.C. § 6323, purports to give a measure of protection to mortgagees and others named therein. It provides, in part, that except as otherwise provided therein a federal tax lien shall not be valid as against any mortgagee, pledgee, or judgment creditor until notice thereof has been filed. Any lien of a surety is necessarily state created. However, the United States Supreme Court holds that a state's characterization of a lien is not binding on the federal courts in cases involving federal tax liens. See cases cited in Mason City & Clear Lake R. Co. v. Imperial Seed Co., D.C.1957, 152 F. Supp. 145, 151. Therefore, sureties on the bonds of defaulting contractors and others who assert priority over a conflicting federal tax lien on the ground that they come within the group specified in Section 6323 frequently encounter what is to them the wicked sister "conventional." The United States Supreme Court in the cases referred to holds that even if under the state law a party does have the status of a mortgagee or judgment holder he will not come within the protection of Section 6323 unless the mortgage or judgment is of the "conventional" type. The standards of conventionality are those set up by the United States Supreme Court.

An early and leading case as to the rights of a surety on the bond of a defaulting contractor is the case of Prairie State Nat. Bank v. United States, 1896, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. In that case one Hitchcock, the surety on a construction performance bond of Sundberg & Company, had contracted to build a custom house for the United States. The United States retained ten per cent of the value of the work executed pending completion. During the course of the work the contractor borrowed money to carry on the construction from the Prairie State Bank secured by an assignment of the retained percentage. The contractor defaulted in the performance of the contract and the surety was compelled to complete it at a cost in excess of the purchase price. The surety and the bank both made claim to the retained percentage. The bank's assign-

ment was ineffective under the federal anti-assignment law, 31 U.S.C.A. § 203. However, the Court referred to the bank's assignment as giving rise to an equitable lien. It also referred to the surety as having an equitable lien. The Court stated that the owner had the right to apply the withheld funds on the damages sustained by it because of the contractor's breach of contract and that the surety by subrogation was substituted to the owner as to such right and that such right related back to the execution of the bond. The Court in its discussion indicated that the surety had independent contractual rights as distinguished from derivative rights but did not clearly mark out the nature and extent of the independent contractual rights. The Court awarded the retained percentage to the surety. It stated that the bank's lien being derived from the contractor and being dependent upon the results of the construction contract with the owner was subordinate to the contract rights of the owner and therefore subordinate to the surety who was substituted in place of the owner. The Court did not make it clear why it was thought necessary to also ascribe an equitable lien to the surety. However, it would seem that the holding of the Court in that case was that a surety on the bond of a defaulting contractor is subrogated to the rights of the owner as to withheld payments and prevails over claimants whose claims thereto arise between the time the bond is executed and the loss is paid by it on the theory of relation back.

There are a number of later cases which are in accord with the holding in the foregoing case that the rights of a surety on a contractor's bond relate back to the execution of the bond. Henningsen v. U. S. Fidelity & Guaranty Co., 1908, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Hardaway v. National Surety Company, 1909, 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321; Exchange State Bank v. Federal Surety Co., 8 Cir., 1928, 28 F.2d 485; United States Fidelity & Guaranty Co. v. Sweeney, 8 Cir., 1935, 80 F.2d 235;

First National Bank in Winfield, Kan. v. Fidelity & Deposit Co., 10 Cir., 1933, 65 F.2d 959.

Prior to the case of United States v. R. F. Ball Construction Co., Inc., supra, in cases involving conflicting claims between the surety for a defaulting contractor and the Government as a holder of a federal tax lien, the surety has generally prevailed. It has prevailed either upon the theory of subrogation or equitable lien or the theory that there was "no debt" owing to the defaulting contractor to which the federal tax lien could attach. In the cases next cited the surety prevailed upon the theory of equitable lien related back. American Surety Co. v. City of Louisville Municipal Housing Commission, D.C.1945, 63 F.Supp. 486, affirmed Glenn v. American Surety Co., 6 Cir., 1947, 160 F.2d 977; New York Casualty Co. v. Zwerner, D.C.1944, 58 F.Supp. 473; American Fidelity Co. v. Delaney, D.C.1953, 114 F.Supp. 702, 710. See also United States v. Crosland Const. Co., D.C.1954, 120 F.Supp. 792, affirmed, 4 Cir., 1954, 217 F.2d 275. In the case of Vincent v. P. R. Matthews Co., D.C.1954, 126 F.Supp. 102, the surety prevailed upon the theory of subrogation and equitable lien related back.

It is to be noted that in all of those cases there inhered the theory of relation back and that none of them were reviewed by the United States Supreme Court. In the case of United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, 1947, 297 N.Y. 31, 74 N.E.2d 226 (see Comment, 32 Minn.L.Rev. 645), the surety prevailed both on the theory of equitable lien and that no debt was due. In the case of United States Fidelity & Guaranty Co. v. United States, 10 Cir., 1952, 201 F.2d 118, it was held that the surety on the bond of a defaulting contractor had priority over a federal tax lien on the theory of relation back. The Court was of the view that the case of United States v. Security Trust & Savings Bank, supra, which held that an attachment lien could not secure priority over a federal tax lien on the theory of relation back was distinguishable.

In other more recent cases the surety has prevailed under the "no debt" theory. Fidelity & Deposit Co. v. New York City Housing Authority, 2 Cir., 1957, 241 F.2d 142; Great American Indemnity Co. v. United States, D.C.1954, 120 F.Supp. 445; United States Fidelity & Guaranty Co. v. Miller, D.C.1956, 143 F.Supp. 941; Colusa-Glenn Production Credit Ass'n v. Phoenix Ins. Co., D.C.1956, 145 F.Supp. 844; Steelcraft Manufacturing Co. v. Hewkin, D.C.1956, 148 F.Supp. 872; Scott v. Zion Evangelical Lutheran Church, 1955, 75 S.D. 559, 70 N.W.2d 326; Robertson v. Huntley & Blazier Co., 1953, 351 Ill.App. 378, 115 N.E.2d 533. See also Transmix Concrete v. United States, D.C.1956, 142 F.Supp. 306; United States v. Kings County Iron Works, 2 Cir., 1955, 224 F.2d 232; Aquilino v. United States, 1957, 3 N.Y.2d 511, 169 N.Y.S.2d 9, 146 N.E.2d 774, petition for certiorari filed June 27, 1958.

Between 1950 and 1958 all of the United States Supreme Court cases in which competing non-federal liens fared so badly in competition with federal tax claims were cases in which the competing non-federal lien was a statutory lien. Those decisions left little doubt that in the society of liens according to the United States Supreme Court classification federal tax liens were the elite and that liens arising under state statutes were, so to speak, denizens of "skid row."

It was the expectation of some that contractual or consensual liens might have a better standing. However, the recent decision of the United States Supreme Court in the case of United States v. R. F. Ball Construction Co., Inc., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510, indicates that such expectation was not well founded. The decision of the District Court in that case appears in R. F. Ball Construction Company v. Jacobs, 140 F.Supp. 60 and of the Court of Appeals in United States v. R. F. Ball Construction Co., Inc., 239 F.2d 384. In that case the R. F. Ball Construction Company was a sub-contractor on two unrelated sub-contracts. The second bond was executed more than nine months after the first bond. The contracts provided for retained percentages. The surety suffered no loss on the first bond and the retained percentage subsequently became due and owing the contractor from the owner. In the application for the first bond the contractor assigned to the surety the contract funds not only for losses growing out of that bond but also for the "payment of any other indebtedness or liability" of the contractor to the surety whether heretofore or hereafter incurred. Under the second bond the surety did suffer a loss. Federal tax liens were filed against the contractor subsequent to the execution of both bonds and subsequent to the time the retained percentage became due and owing from the owner under the first subcontract. The District Court held that under the Texas law the surety had the status of a mortgagee and that as a mortgagee came within the protection of Section 6323 of the Internal Revenue Code of 1954 (Section 3672 Revenue Act of 1939, 26 U.S.C. § 3672) relating to the filing of federal tax liens. The United States Court of Appeals affirmed on the basis of the opinion of the District Court. Certiorari was granted and the judgment of the Circuit Court of Appeals reversed in a Per Curiam opinion which was as follows [355 U.S. 587, 78 S.Ct. 443]:

"The judgment is reversed. The instrument involved being inchoate and unperfected, the provisions of § 3672(a), Revenue Act of 1939, 53 Stat. 449, as amended, 53 Stat. 882, 56 Stat. 957 [26 U.S.C.A. § 3672 (a)], do not apply. See United States v. Security Trust & Savings Bank, 340 U.S. 47 [71 S.Ct. 111, 95 L.Ed. 53]; United States v. City of New Britain, 347 U.S. 81, 86–87 [74 S.Ct. 367, 370–371, 98 L.Ed. 520]. The claim of the interpleader for its costs is controlled by United States v. Liverpool & London & Globe Ins. Co., 348 U.S. 215 [75 S.Ct. 247, 99 L.Ed. 268]."

Four of the Justices dissented on the ground that the assignment contained in the first bond application constituted the surety a "mortgagee" within the meaning of Section 6323 Internal Revenue Code of 1954 (Section 3672 Internal Revenue Code of 1939).

From the Per Curiam opinion of the majority in that case, it seems clear that the United States Supreme Court will apply the specific and perfected test to liens which compete with federal tax claims whether such competing liens are statutory in character or contractual or consensual in character. The citation in the majority opinion of the case of United States v. Security Trust & Savings Bank, supra, indicates that neither type of lien may secure priority over a federal tax lien on the theory of relation back. There would seem to be implicit in the holding of the majority in that case the doctrine that a federal tax lien will prevail over a previous assignment to secure a contingent obligation if the event against which the assignee sought protection had not occurred when the federal tax lien arose and this upon the theory that until such event arose the assignment was inchoate and unperfected. The assignment in that case constituted the assignment of contract funds due under an unrelated contract. In the present case the indemnity assignment is contained in the same contract which gave rise to liability. As to what impact the holding in the case of United States v. R. F. Ball Construction Co., Inc., supra, might have in such a situation is not clear. In the case of Commercial Standard Insurance Company v. Campbell, D.C. 1956, 146 F.Supp. 919, the surety sought to prevail over a federal tax lien against the contractor. The surety relied in part upon the indemnity assignment contained in the bond application. The District Court held that the federal tax lien prevailed. It stated (at page 923):

"That assignment having been made to become effective on the date of the application for bond, on the happening of a future contingency, created merely a lien * * * and since it governed funds to become due in the future is equitable. * * * As such, the assignment was inchoate and unperfected (at the time the Government's lien arose) * * * "

In that case the Court found that the funds in controversy belonged to the Contractor at the time the tax lien arose. On appeal, 5 Cir., 1958, 254 F.2d 432, at page 433, the United States Circuit Court of Appeals stated:

"Disposition of this appeal has been held in abeyance awaiting the decision of the Supreme Court in United States v. R. F. Ball Construction Co., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510. The judgment of the District Court, whose opinion in the present case is reported in 146 F. Supp. 919, is in accord with that decision, except as to the award by the District Court out of the funds of attorneys' fees * * * "

It has been heretofore noted that sureties on the bonds of defaulting contractors have sought to assert rights to money ostensibly due from the contractor to the owner under various theories. In some cases they sought to assert rights as a subrogee of the holders of mechanics' liens paid by them. In the present case the mechanics' liens involved had never become perfected. Under the decisions of the United States Supreme Court referred to, it would be of no avail to the Surety in this case to be subrogated to the holders of such liens.

It would also be of no avail to the Surety in the present case to be the subrogee of the Contractor. In the case of Prairie State Nat. Bank v. United States, 1896, 164 U.S. 227, at page 232, 17 S.Ct. 142, at page 144, 41 L.Ed. 412, the Court stated:

"A great deal of confusion has arisen in the case by treating Hitchcock as subrogated merely 'in the rights of Sundberg & Co.' in the fund, which, in effect, was saying that he was subrogated to no rights whatever."

In the case of Moran v. Guardian Casualty Co., 1935, 64 App.D.C. 188, 76 F.2d 438, at page 439, the Court states that the rights of the defaulting contractor are "generally bootless." The matter of the possible rights of the Surety as a subrogee of the owner will be later referred to.

Under the doctrine of the early United States Supreme Court case of Prairie State Nat. Bank v. United States, supra, the Surety in this case might be regarded as the holder of an equitable lien which related back to the bond application. However, in view of the recent decisions of the United States Supreme Court it would seem that the Surety herein cannot prevail over the federal tax liens in question on that theory.

In the present case the bond application contained an indemnity assignment from the Contractor to the Surety. If it be considered merely as an assignment it would run afoul of the rule relating to perfectedness adhered to by the United States Supreme Court in the case of United States v. R. F. Ball Construction Co., Inc., supra.

If the assignment were considered to be a chattel mortgage, then it would run afoul of the "conventional" rule impliedly followed by the majority in the case of United States v. R. F. Ball Construction Co., Inc., supra. The tests adopted by the Iowa Supreme Court for a chattel mortgage are set forth in Mason City & Clear Lake R. Co. v. Imperial Seed Co., D.C.1957, 152 F.Supp. 145, 151. However, in view of the case of United States v. R. F. Ball Construction Co., Inc., supra, those tests would be of academic interest only in the present case.

In the present case on February 23, 1956, the Contractor executed another assignment to the Surety. That assignment was made after most of the federal tax liens had been filed. If anything was coming to the Contractor at that time, the assignment would not be of avail to the Surety.

It was heretofore noted that in the case of Prairie State Nat. Bank v. United States, supra, the United States Supreme Court announced that the surety on the bond of the defaulting contractor was the subrogee of the owner. It was the thought of one Court and apparently of the Government in the present case that such holding was overruled by the later case of United States v. Munsey Trust Co., 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022. Such was the view of the District Court in the case of Fidelity & Deposit Co. v. New York Housing Authority, D.C.1956, 140 F. Supp. 298. However, the holding of the District Court giving priority to a federal tax lien based upon that theory was reversed on appeal (2 Cir., 1957), 241 F. 2d 142, on the ground that there was no debt to which the federal tax lien could attach. In the case of United States v. Munsey Trust Co., supra, the surety was a surety on payment bonds of a contractor who had entered into contracts to paint and repair some federal buildings. The bonds were conditioned for the payment of the claims of those furnishing labor and materials in connection therewith. The work was completed. The surety was compelled to pay a number of such claims. It asserted a claim to the percentages retained by the United States in connection with the contracts. The United States applied a substantial amount of the retained percentages on a claim it had against the contractor on an unrelated contract. It was the claim of the surety that the United States had the right to retain and use the retained money to pay the unpaid materialmen and laborers and that such right devolved upon it. The United States Supreme Court denied the claim of the surety to the retained percentages. It stated that the United States had suffered no loss by the failure of the contractor to pay the materialmen and laborers for the materialmen and laborers could not enforce any claim against it and they could not file a lien against its buildings. In other words, in that case the owner had suffered no loss or damage because of the default of the contractor in the matter of paying the materialmen

and laborers. The United States Supreme Court uses some language in the opinion in that case which might be construed as not being in harmony with the rule announced by it in the case of Prairie State Nat. Bank. v. United States, supra, but it is questionable whether the holding is in conflict with that rule. Some writers on the subject are of the view that the supposed right of a surety to be subrogated to the owner's right to withheld payments may be questionable in theory. Plumb, Federal Tax Collection and Lien Problems, 13 Tax Law Review 459, 507 (May 1958); Anderson, Wages & Taxes—A Surety's Headache, 5 Hastings Law Journal 144, 167 (1954). It could well be that the rule announced by the United States Supreme Court to the effect that the surety on the performance bond of a defaulting contractor is a subrogee of the owner would not be followed by that Court.

There is another phase of the case that requires consideration. The consideration of that phase necessitates a review of the situation in the present case. Under paragraph 4 of the contract between the Owner and Contractor in this case, it was provided that "The Owner shall pay the Contractor for the performance of the contract * * * $30,591.00." Paragraph 5 of the contract provided that the payments were to be made in accordance with the specifications. The specifications provided that the Owner was to pay one-third of the amount of the contract upon completion of the basement portion of the residence, another one-third when the Contractor was ready to begin the interior finishing of the structure, and the final payment was to be made upon completion. One Court has made a distinction between progress payments and retained percentages and has recognized the claim of a surety on a bond of a defaulting contractor over the claim of a subsequent intervening claimant as to the retained percentage but not as to the progress payments. General Casualty Co. v. Second Nat. Bank of Houston, 5 Cir., 1949, 178 F.2d 679. The theory being that the retained percentage was retained by the owner as protection for the owner and the surety against the default of the contractor but that such was not the situation as to progress payments. The distinction made by the Court between progress payments and retained percentage would seem to be subject to question. However, in the present case no retained percentage is involved and the two progress payments provided for are not involved. The two progress payments were paid to the Contractor before the liens of the Government arose and prior to any default in the performance of the contract by the Contractor. What is involved in the present case is the final payment which was to become due the Contractors upon completion of the contract. The contract provided that the structure was to be completed by December 1, 1955. The Contractor did not complete the structure by December 1, 1955, and in fact never did complete it in accord with the provisions of the original specifications. Before the Contractor had become entitled to the final payment, he breached the contract by failing to keep the Owner's property free from mechanics' liens. If those liens were not paid the Owner would lose his residence having a contract value of approximately $30,000 and the lot upon which it stood. The amount of those liens being greatly in excess of the final payment that would be due the Contractor upon completion, the liability of the Contractor for breach of its contract in connection with the provision relating to mechanics' liens was similarly in excess of the final payment that would be due it on completion. The liability of the Contractor for such damages accrued prior to the time that any credit accrued to him by way of final payment.

Prior to the escrow agreement of June 26, 1957, escrowing the sum of $10,168.-46, the situation would seem to have been as next set forth. The Contractor was liable to the Owner for damages previously accrued in the amount of $19,248.-

02.[1] Under the Account Stated there had subsequently accrued to the credit of the Contractor the sum of $10,168.46. The credit of $10,168.46 provided for by the Account Stated was withheld by the Owner. Therefore, immediately prior to the Escrow Agreement the Owner had in his hands the sum of $10,168.46. However, the Contractor was liable to him for damages for antecedent breach of contract in the sum of $19,248.02. That claim for damages remained unpaid for several months.

 The tax lien statute provides that the Government shall have a lien upon property and rights to property whether real, personal or mixed belonging to the delinquent taxpayer. In the present case the only property which could possibly belong to the Contractor was the contractual obligation of the Owner to it under the construction contract. The only contractual obligation of the Owner to the Contractor which would be of legal interest would be the obligation of the Owner to pay money due it. To say that the Government's tax lien attaches only to property belonging to the delinquent taxpayer is not to necessarily say that the Government stands in the shoes of the taxpayer. By its lien the Government may acquire rights which the delinquent taxpayer did not have. See Mason City & Clear Lake R. Co. v. Imperial Seed Co., supra, and Anderson, Federal Tax Liens—Their Nature and Priority, 41 California Law Review 241, 252 (1953). A property right of a delinquent taxpayer may be born with a tax lien upon it. However, it is still necessary that a property right be born to the delinquent taxpayer before there is anything to which the lien could attach.

 The United States Supreme Court has but recently stated that the tax lien statute does not create any property rights but merely attaches the rights created under the applicable state law. United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135. Therefore, in the present case in order for the Government's tax liens to be of avail to it, there must at some time have been created under state law some enforceable right in behalf of the Contractor against the Owner for money due under the contract. As heretofore noted, at the time the tax liens arose the Contractor had already been paid the progress payments and the only money that could thereafter be due it would be the money due it upon the completion of the contract. Before that latter event occurred the Contractor had committed a breach of contract, the damages for which amounted to $19,248.02.

 In the Account Stated the Owner waived the completion of certain items specified in the specifications and accepted the residence as completed. In the Account Stated the Owner and Contractor agreed as to the amount that would have been due the latter, except for its breach of contract for mechanics' liens. That amount was $10,168.46. The Owner in the Account Stated did not purport to release that sum to the Contractor. At that time the Contractor did not have an enforceable right to be paid the credit, and the Government had no greater rights. At that stage the Contractor was a debtor and not a creditor. In order that there be some property right to which the Government tax liens could attach, the Contractor would have to be transformed from a debtor into a creditor. The escrow agreement did not purport to work any such transformation and the Court is unable to find any other event, occurrence, or transaction that did work such transformation. The record is barren of any proof that the Contractor subsequent to the arising of the tax liens was ever entitled to any money under the contract.

It is the view of the Court that the "no debt" doctrine heretofore referred to is applicable in the present case.

---

1. The amount of the liens originally filed was in the sum of approximately $23,000 which was reduced to $19,248.02 by adjustments.

The leading case in which a surety on the bond of a defaulting contractor prevailed over a federal tax lien on the "no debt" theory is the case of Fidelity & Deposit Co. v. New York City Housing Authority, 2 Cir., 1957, 241 F.2d 142. The Court in that case after referring to the federal tax lien statute stated (at page 144):

"In adopting this legislation, the Congress did not create property interests on which a lien might be imposed; there is no suggestion that it authorized the federal courts to do so."

The Court after referring to the more recent decisions of the United States Supreme Court stated (at page 145):

"These cases make it perfectly clear that: (1) the classification of state created rights and (2) the weighing of relative priorities under Section 3670, are both matters of federal law. But here we are concerned with the question of whether or not a contractual right exists and that we hold is a matter of state law only."

The Court further stated (at page 147):

"We are satisfied, then, that * * the taxpayer-contractor had no right to the withheld fund. Of necessity, it follows that it had no 'right to property' to which a federal tax lien might attach and the government's claim must fail."

The most recent opinion of the United States Supreme Court involving tax liens is the case of United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135. That case is of interest in that it is one of the few recent tax lien decisions of that Court in which the opinion was the opinion of an unanimous court and not disposed of by a per curiam opinion. That case is of further interest in that it cites by way of authority for one of its pronouncements the case of Fidelity & Deposit Co. v. New York City Housing Authority, supra, which as just noted is the leading case in support of the "no

debt" theory. The citation of it appears on page 1057 of 78 S.Ct.:

"Since § 3670 creates no property rights but merely attaches consequences, federally defined, to rights created under state law, Fidelity & Deposit Co. v. New York City Housing Authority, 2 Cir., 241 F.2d 142, 144, we must look first to Mr. Bess' right * * * as defined by state law."

In the case of Fidelity & Deposit Co. v. New York City Housing Authority, 2 Cir., 1957, 241 F.2d 142, just referred to, and in other cases in which it was held that the Government had no claim to the withheld funds under the "no debt" theory, the courts have stopped short with such a holding and do not discuss the basis of the right of the surety to such funds. Upon reversal and remand to the District Court by the Circuit Court of Appeals for the Second Circuit in the case of Fidelity & Deposit Co. v. New York City Housing Authority, supra, the District Court rendered summary judgment in favor of the surety, 1957, 157 F.Supp. 87. In its opinion the District Court states (at page 89):

"Since the Government has no interest in the withheld funds, no question arises either as to the true nature of the surety's equitable lien thereon or as to the relative priority of interests of the surety and the Government therein."

Apparently it is the thought of the courts referred to that if the delinquent taxpayer had no property interest in the property against which the Government had attempted to assert a tax lien, the matter of the rights of other parties in and to the property would be of academic interest only, so far as the Government is concerned.

In the present case since it appears that neither the delinquent taxpayer Contractor nor the Government had any right to the $10,168.46 in question, it would seem that the matter of the ownership thereof is one between the Owner

and the Surety. The Owner agreed in the Escrow Agreement that if the Government was not entitled to the $10,168.46 it was to be paid to the Surety. Apart from that and apart from any rights that the Surety might have as a subrogee, or as a holder of an equitable lien, or as an assignee, it would seem that there is another theory which the Surety, if necessary, might assert to the $10,168.46.

The bond was tri-party in character. It gave rise to tri-party rights and duties. The more important of the duties were the duties owing by the Surety to the Owner and the Contractor to the Surety. The more important of the rights were the rights of the Owner against the Surety. However, it would seem that the Owner was not free from all duty or obligation to the Surety. It would seem that after the breach of the contract by the Contractor the Owner did owe the Surety the duty of not diverting funds thereafter arising under the contract away from the payment of the claim for damages for the antecedent breach. The corresponding right of the Surety in that regard would seem to be direct and not derivative in character. It was heretofore noted that the United States Supreme Court in the case of Prairie State Nat. Bank v. United States, supra, stated that the surety on a contractor's bond did have independent rights.

In the present case when the Contractor breached its contract in regard to mechanics' liens it gave rise to a claim for damages in favor of the Owner in the amount of the valid lien, to wit, the sum of $19,248.02. Under the Account Stated the Owner was subsequently given a credit of $10,168.46 because of work done under the defaulted contract. That amount constituted funds in the hands of the Owner applicable to those damages. If there had been no surety involved, there could be no question but that there was no way in which a tax lien could deprive the Owner of the right to apply the said sum of $10,168.46 upon his existing claim for damages. In this case there was a surety which had become liable for the damages sustained by the Owner for the breach of contract. As to the Contractor the Owner had the right to so apply the funds in his hands on his past due and unpaid claim for damages and as to the Surety it was apparently his direct duty to so do. Except for the intervention of the Government with its tax liens, it would have been so applied. However, as a result of that intervention the sum was not so applied but placed in escrow. Because the sum of $10,168.46 was tied up by the Government tax liens, the Surety paid the entire damages of $19,248.02 sustained by the Owner. The Surety in legal effect asked and asks that the said sum of $10,168.46 be so applied on the damage claim. It would seem that the right of the surety to have the sum so applied is not necessarily based on any derivative rights but could be upon its direct contractual rights. It would seem that where the obligor of a bond has breached its contract with the obligee and a claim for damages has accrued from such breach that the obligee of the bond owes a direct duty to the surety on the bond to apply upon such damages the credits which subsequently accrue under the contract to the defaulting obligor.

This Court previously referred to the rule announced by the United States Supreme Court to the effect that the surety on the bond of a defaulting contractor was subrogated to the rights of the owner as to withheld funds. Prairie State Nat. Bank v. United States, 1896, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. It is possible that that rule may still have some vitality. It would seem probable that the "no debt" rule has greater vitality. Under the "no debt" rule the Government has no claim to the fund in question.

It is the view of the Court that the Surety in this case has the right to have the sum of $10,168.46 applied upon the damages which were due the Owner from the Contractor and which were paid by it.

It is the holding of the Court that the Government has no claim to the said sum.

It is the further holding of the Court that the said sum is payable to the Surety.

Judgment will be entered awarding the said sum to the Surety and quashing the levies heretofore made by the District Director.

The foregoing opinion will constitute the findings of fact and conclusions of law herein. Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.