**FIRST STATE BANK OF MEDFORD,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant,
and
**Harry L. Altman, Intervener.**

Civ. No. 565.

United States District Court
D. Minnesota,
First Division.

July 11, 1958.

Order Oct. 13, 1958.

Wallace M. Tripp (of Nelson, Casey & Tripp), Owatonna, Minn., for plaintiff.

George E. MacKinnon, U. S. Atty., and Kenneth G. Owens, Asst. U. S. Atty., St. Paul, Minn., for defendant.

Ralph S. Schneider and Harry L. Altman (of Altman, Hennen, Malmon & Schneider), Minneapolis, Minn., for intervener.

NORDBYE, Chief Judge.

The above-entitled cause came before the Court for trial without a jury.

This suit was brought to determine the ownership of $2,500 on deposit with the Clerk of the District Court of Dodge County, Minnesota. The dispute arises by reason of the following facts and circumstances.

Some time prior to June, 1954, Kenneth W. Hammann and Harvey L. Hustad formed a partnership doing business as Owatonna Trenching Service (hereinafter called Owatonna or the partnership). Owatonna entered an oral agreement with Underground Constructors, Inc. (hereinafter called Underground) to perform certain operations in the installation of natural gas distribution systems in Windom and Mountain Lake, Minnesota. Under the agreement, Underground agreed to pay Owatonna eighty per cent of the amount due it as

the work progressed, but Underground retained twenty per cent of the contract price as a holdback until completion and acceptance of the job.

After entering this contract, Hammann and Hustad approached an officer of the First State Bank of Medford (hereinafter called the Bank) to finance the operation. On June 30, 1954, the Bank loaned Owatonna $2,000. A note evidencing the indebtedness was made due in 60 days, and the $2,000 borrowed was deposited in Owatonna's checking account.

On July 29, 1954, the partners procured another loan from the Bank. This note was for $2,800, payable on September 1, 1954. This credit was extended upon the strength of a purported oral assignment by Owatonna to the Bank of moneys due Owatonna from Underground. In connection therewith, the Bank received a letter from W. C. Donaldson, president of Underground, which stated:

"August 2, 1954
"First State Bank of Medford
Medford, Minnesota
"Gentlemen:

"We have been requested by the Owatonna Trenching Service to assign the payments due them to your bank.

"We have no objections to doing this and we will from the above date make out all payments due the Owatonna Trenching Service to them and your bank and send them to you when due. These will be accompanied with a statement of the footages and amounts withheld until the work is completed.

"This assignment only pertains to the Windom, Mountain Lake jobs, and will be in force until we are requested to change these conditions.

"Yours very truly
Underground Constructors
By
(signed) W. C. Donaldson
W. C. Donaldson (Pres.)"

Thereafter, except in one instance, Underground made the checks payable to the Bank, and the Bank then deposited the checks in Owatonna's checking account. After the assignment, Underground also paid certain creditors of Owatonna who might possess liens against the completed job. These amounts were deducted from the amount paid over to Owatonna without the Bank's knowledge or consent. It may be noted at this point that one check was made payable to Owatonna rather than to the Bank after the purported assignment. In addition, one check issued prior to the purported assignment was made payable to the Bank rather than to Owatonna. After the notes fell due, four checks, dated September 8, 1954, for $7,298.75, September 22, 1954, for $3,069.56, October 8, 1954, for $5,940.80, and October 19, 1954, for $2,000, totaling $18,309.11, were made payable to the Bank, but the Bank deposited the checks in Owatonna's checking account and did not apply any part of these funds toward satisfaction of Owatonna's notes. The Bank contends that it did not satisfy Owatonna's indebtedness because the partners assured the Bank that Underground still owed Owatonna $17,500. This latter amount far exceeded Owatonna's indebtedness, and being included in the alleged assignment it would cover Owatonna's obligation to the Bank.

On November 23, 1954, the District Director of Internal Revenue received a $6,428.53 assessment against Owatonna for its failure to pay withholding deductions to the Government. A specific and perfected tax lien attached as of this date. On January 18, 1955, Underground was sent a Notice of Levy against Owatonna. Underground acknowledged receipt of the notice on January 20, 1955.

The Bank did not realize until January or February of 1955 that Owatonna was in financial difficulty. It then proceeded to reduce its notes to judgment, but the judgments were not obtained until September 15, 1955. In the meantime, intervener Altman had entered the picture as an accountant. He conducted

an audit of Owatonna's books in December, 1954, and billed Owatonna for these services. The indebtedness thereby incurred by Owatonna has been paid or discharged in Owatonna's subsequent bankruptcy. However, a dispute had arisen during this time between Owatonna and Underground as to the amount due Owatonna for holdbacks and extra work not covered by the contract. Owatonna claimed that $17,500 was due. Underground refused to pay anything, and Owatonna engaged Altman, this time as its attorney, to collect the sum. Through Altman's efforts the claim was finally settled on April 17, 1956, for $2,500. This fund was paid into State Court pending a determination of its ownership. Altman received nothing for his services as Owatonna's attorney. Both Hammann and Hustad have gone through bankruptcy. Altman apparently did not file a claim in bankruptcy for attorney's fees and did not, therefore, collect a fee from either of them.

■■■ It seems amply evident that Owatonna intended to give some form of oral assignment to the Bank of funds coming due from Underground. There is no real dispute in the testimony as to this. As between Owatonna and the Bank, the validity of this assignment is not questioned. Determining the nature of the assignment is more difficult and is actually the key to the entire case. The Government contends that so far as creditors were concerned, the assignment was fraudulent because it was not in writing and was not recorded. Section 513.17, Minn.Stat.Ann., states:

> "Every assignment of a debt, unless the same be in writing and be filed with the clerk of the town or municipality in which the assignor resides, shall be presumed to be fraudulent and void as against his creditors, unless those claiming thereunder make it appear that it was made in good faith and for a valuable consideration: Provided, that this section shall not apply to debts evidenced by writing subscribed by the debtor, and delivered

to the assignee at the time of the assignment thereof. Assignments required by this section to be filed need not be acknowledged."

However, as the Bank points out, this statute merely provides a rule of evidence. Telford v. Hendrickson, 1913, 120 Minn. 427, 139 N.W. 941. The presumption of fraud has been overcome here by a showing that the assignment was given in good faith and for a valuable consideration (the procurement of credit).

■■■ Having found that the assignment was not rendered invalid by Section 513.17, Minn.Stat.Ann., we can proceed to consider further the nature of the assignment. In discussing the nature and effect of the Bank's assignment, some basic factors must be borne in mind. Quite obviously the Bank did not purchase Owatonna's right to future payments from Underground. The Bank demanded an assignment as security. There never was any intention to grant or receive more than a security interest. Primarily, then, the Bank's interest is in the nature of a lien. The difference between an assignment and a lien is set forth in Springer v. J. R. Clark Co., 8 Cir., 1943, 138 F.2d 722, 726, where it states that "A lien is distinguished from an assignment in that it is a charge upon property, while an assignment creates an interest in property." Certainly, the Bank did not treat the moneys it received from Underground as though it had an immediate interest therein. The checks were deposited to Owatonna's account even after the notes fell due. Regardless of what Owatonna may have told the Bank concerning holdbacks and extra work, the Bank's treatment of the funds is consistent only with a lienhold interest. In this regard the Springer case states, at page 726,

> "If the intention of the parties to make an equitable assignment or to create an equitable lien arises by necessary implication from the terms of the agreement, construed with reference to the situation of

the parties at the time of the contract, and by the attendant circumstances, such equitable right will be enforced by a court of equity against the fund."

From this the conclusion can be drawn that the Bank had a lienhold interest by virtue of its assignment.

█ The question then arises as to whether or not the Bank falls within one of the privileged classes as contemplated by 26 U.S.C.A. § 6323(a), which provides,

"(a) Invalidity of lien without notice.—Except as otherwise provided in subsection (c), the lien imposed by section 6321 shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the Secretary or his delegate * * *."

If the Bank is one of those privileged by the statute, it must be either a pledgee or mortgagee. No serious argument has been advanced by the Bank that it is a pledgee, and no special consideration will be given to such a theory. It is urged, however, that the Bank is, in one sense, a mortgagee. That may be true. This does not mean, however, that the Bank is a mortgagee as contemplated in the statute. The Supreme Court has imposed a "perfected lien" standard upon lien interests that are recognized under this statute. United States v. White Bear Brewing Company, 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871; United States v. Colotta, 350 U.S. 808, 76 S.Ct. 82, 100 L.Ed. 725; United States v. City of New Britain, Conn., 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520; United States v. Security Trust & Savings Bank of San Diego, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53. As counsel for the Government points out, development of the law along these lines is of recent origin. The most recent case is United States v. R. F. Ball Construction Co., Inc., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed. 2d 510. That case was initiated in the Western District of Texas as R. F. Ball Construction Co., Inc., v. Jacobs, D.C.W.D.Tex.1956, 140 F.Supp. 60. The case is similar to the one at bar, so a rather complete analysis and comparison will be helpful.

Ball procured a housing project contract in San Antonio and subcontracted the painting and decorating to Jacobs. On July 21, 1951, Jacobs applied to a bonding company for a performance bond. As collateral security for protection of the bonding company, Jacobs assigned in writing to the bonding company all percentages retained by Ball under the subcontract. The assignment was made as security not only for possible losses growing out of the San Antonio job, but also for payment of any indebtedness or liability "whether heretofore or hereafter incurred." Thereafter, on April 4, 1952, Jacobs obtained a similar bond with the same company on a different subcontract in Louisville, Kentucky.

On April 30, 1953, the holdbacks on the San Antonio job were finally determined to be $13,228.55. In May, June and September of 1953, the Government filed tax liens against Jacobs totaling approximately $17,000. Some time thereafter, the bonding company's contingent liability on the Louisville job ripened into an actual liability, and the bonding company was required to pay out $12,971.88.

Not knowing to whom the $13,288.55 owing on the San Antonio job should be paid, Ball instituted an interpleader action to determine the rights of various creditors. The suit finally resolved itself into a dispute between the bonding company and the Government. The bonding company claimed that the assignment of the amount owing on the San Antonio job created a lien upon that fund which carried forward to the liability incurred by reason of Jacobs' default on the Louisville job. The bonding company contended that this lien placed it within the privileged categories of "mortgagee,

pledgee, purchaser, or judgment creditor" under Section 3672 of the Internal Revenue Code of 1939 (now 26 U.S.C.A. § 6323). The District Court was well aware of the Supreme Court decisions stating that liens, to be cognizable, must be more than inchoate and unperfected interests. Nevertheless, the District Court accepted the reasoning of the bonding company that the assignment as collateral security was a perfected contractual lien rather than the unperfected statutory type of lien which had theretofore been ruled upon by the Supreme Court.

The Court of Appeals affirmed the District Court in a per curiam decision, United States v. R. F. Ball Construction Co., Inc., 5 Cir., 1957, 239 F.2d 384. The Supreme Court, however, reversed the Circuit Court in a five to four decision. The majority opinion treated the case summarily when it stated (also in a per curiam decision), 355 U.S. at page 587, 78 S.Ct. at page 443,

> "The judgment is reversed. The instrument involved being inchoate and unperfected, the provisions of § 3672(a), Revenue Act of 1939, 53 Stat. 449, as amended, 53 Stat. 882, 56 Stat. 957, 26 U.S.C.A. § 3672(a), do not apply. See United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53; United States v. City of New Britain, Conn., 347 U.S. 81, 86–87, 74 S.Ct. 367, 370–371, 98 L.Ed. 520. The claim of the interpleader for its costs is controlled by United States v. Liverpool & London & Globe Ins. Co., 348 U.S. 215, 75 S.Ct. 247, 99 L.Ed. 268."

This language clearly shows that the majority of the Court regarded the assignment as an inchoate and unperfected lien. The Bank here, however, points out that the assignment in the Ball case was made to secure a contingent or future indebtedness and that the assignment under consideration by this Court was given to secure a present and ascertained indebtedness. Admittedly, this is a distinguishing characteristic, but the distinction does not perfect an unperfected lien. Nor was the assignment to the Bank so definite as it contends. This is shown by the Bank's treatment of the moneys it did receive. The fact that the checks were made payable to the Bank is not particularly enlightening because at least one check was made so payable before the assignment, and conversely, one check after the assignment was made payable to Owatonna. The Government admits that the Bank may have obtained a perfected right to the payments it received and put into Owatonna's checking account. These funds were at least reduced to possession by the Bank, but this is not true of the unpaid fund here in suit.

The fact that the purported assignment here was given to secure a specified sum, and that the notes fell due on dates certain, relieved any lien which might arise of certain *im*perfections, but so far as the tax law is concerned, the lien itself remained *un*perfected, at least until some action was taken to enforce it. Furthermore, the matter of contingency is not limited solely to indefiniteness of time or amount. A lien interest, in and of itself, is indefinite. Contingency is the very basis of liens— if an obligor fails upon a primary obligation, the lienhold interest, though already in existence, becomes the basis of an enforcible right. The exact status of lienhold interests at any particular time always has been a difficult question. It is only proper, therefore, that the courts have erected the "perfected" standard to determine when the lien interest becomes cognizable in the federal tax lien law.

The Court is not particularly concerned with the fact that there are Minnesota decisions which may have recognized that oral assignments are valid and binding upon others than the immediate parties to the assignment. The question here is whether the Bank's lien interest satisfies the standards imposed by the decisions of the federal

courts where the question of priority arises as between a government tax lien and a private unperfected lien. That the federal courts have the final say in federal tax lien matters is basic. United States v. Acri, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264. The oral assignment given to the Bank merely gave rise to an equitable right, but such right cannot be called "perfected" as against the lien of the United States. It is admitted that the Government had no notice of the Bank's alleged lien; in fact, no notice whatsoever was given by the Bank as to its oral assignment. The Bank, although it had ample opportunity to satisfy its lien, was content to rely solely upon its undisclosed lien to secure its indebtedness. It seems clear, therefore, that so far as the Government is concerned, the secret lien of the Bank remained inchoate and unperfected and lay dormant until after the tax lien became perfected. A majority of the court in the Ball case rejected the contention that an assignment as in the case at bar constitutes a mortgage within the meaning of Section 3672(a), Revenue Act of 1939. This Court must hold likewise here.

*Claim of Intervener Altman*

█ It was in November, 1954, that the Government's assessment became perfected and the Government obtained a lien upon all of Owatonna's property and "rights in property." It was not until February, 1955, that Altman performed any services as Owatonna's attorney. Obviously, therefore, the Government's lien existed on all of Owatonna's rights to any property from Underground before Altman performed any legal services in creating the fund in question. He never perfected any lien for such services as required by Section 481.13 of the Minnesota Statutes, M.S.A. However, he now asks the Court to declare an equitable lien on the fund prior to that of the Government's lien, which was perfected some months prior to the commencement of Altman's services. His position is that if the Government obtains the money on deposit, it will be the recipient of funds which were created by him, and in good conscience there should be paid over to him such part of such funds as represents the reasonable value of the legal services which he rendered. In passing it may be noted, though it is probably without any significance here, that when settlement was made in State Court whereby the fund was deposited with the Clerk, Altman in signing the stipulation of settlement which arranged for the deposit, made no reference to any claim for attorney's fees, nor did he indicate in the settlement stipulation that there were any other claimants to the fund except the Bank, the Government, and the Federal Mutual Insurance Company, whose claim was subsequently dismissed. Owatonna was still doing business when it proceeded to settle with Underground. That Altman was looking to Owatonna for payment for any services which he rendered seems evident. He first commenced a suit in State Court against Owatonna requesting $250 for the legal services which he rendered in obtaining the settlement in question. The advent of bankruptcy evidently caused him to pursue his alleged lien claim against the fund. But whatever equitable lien he may have had against the fund, it remained unperfected, and in fact it is in this proceeding that he seeks to have his lien perfected. It may be true as Judge Kalodner stated in Filipowicz v. Rothensies, D.C., 43 F.Supp. 619, 623, 624, that there is a "well recognized principle that an attorney has a lien on a fund which has been created as a result of his efforts in litigation." But the holding in the Filipowicz case cannot be followed. Until rendered specific and definite by a decree of a court, the attorney's lien remains unperfected and inchoate in so far as its status in a federal tax lien case is concerned. If laborers, mechanics and materialmen, who have rendered services in creating

improvements on real estate and filed liens according to state law before the Government perfects its tax lien on such real estate, are nevertheless subordinated to the Government's tax lien, it is difficult to understand under what rationale this Court can elevate Altman's unperfected legal lien to one which is superior to the Government's perfected lien in this case. See United States v. White Bear Brewing Company, 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871, reversing 227 F.2d 359; United States v. Colotta, 350 U.S. 808, 76 S.Ct. 82, 100 L.Ed. 725; reversing 224 Miss. 33, 79 So.2d 474; United States v. R. F. Ball Construction Co., Inc., 355 U.S. 587, 77 S.Ct. 442, 2 L.Ed.2d 510.

The above may be considered the Court's findings of fact, and as conclusions of law the Court finds that the United States has a good and valid lien on said fund prior to the rights of the plaintiff and the intervener herein, and that the United States have judgment that it is entitled to said fund free and clear of any claim of the plaintiff and the intervener herein. Let judgment be entered accordingly.

An order directing the Clerk of the District Court of Dodge County, Minnesota, to pay and deliver said fund to the United States of America in accordance with said judgment may be presented.

Exceptions are allowed.

Order on Intervener Altman's Motion for Amended Judgment.

The intervener herein has made a motion to alter or amend the judgment heretofore rendered in this action in so far as said judgment adjudges that defendant has first priority and fails to adjudge that intervener has first priority to the extent of $500 of that certain fund of $2,500 now held by the Clerk of the District Court, Dodge County, Minnesota. The motion is made on the grounds that the judgment heretofore entered is contrary to law.

The Court heretofore has filed a memorandum decision which sets forth its views on the issues raised in this litigation. It does not seem necessary to elaborate further on the reasons which prompted the Court to hold that the Government had a prior lien on the moneys in question. It may be noted that the intervener fails to consider that, whatever lien he may have obtained by reason of his services as an attorney in creating the fund in question, the Government's lien had attached prior thereto to whatever rights Owatonna had in any moneys due it from Underground.

Reference may be made to United States v. Pay-O-Matic, Inc., D.C., 162 F. Supp. 154. In that case, the City of New York on August 5, 1955, became vested with title to certain trade fixtures of Pay-O-Matic Corporation as part of a condemnation proceeding which the City had commenced. On November 18, 1955, Pay-O-Matic retained Goldstein, an attorney, to represent it in the condemnation suit and agreed to assign to said attorney 25 per cent of any award which might be made for the trade fixtures in question. Thereafter, a notice of lien was filed for professional services by Goldstein with the Comptroller of the City of New York on November 22, 1955. On December 6, 1955, the United States filed a notice of levy upon Pay-O-Matic covering witholding taxes amounting to $16,046.17. Thereafter, notice of Federal tax liens and amendments thereto were filed in the Register's office of New York County. On August 22, 1956, the final decree was entered in the condemnation proceedings awarding Pay-O-Matic a total of $4,569.28 as compensation for the property taken by the City. Goldstein, as attorney for Pay-O-Matic, sought payment of his lien for attorney's services. In disposing of this matter, the court stated, 162 F.Supp. at page 155,

"Under Section 475 of the N. Y. Judiciary Law an attorney's lien is more than mere security; it is

enforceable by remedy in the nature of foreclosure and may not be extinguished by action of the parties. Here Goldstein's lien arose at the commencement of the suit in condemnation and attached to the award finally made. Reisman v. Independence Realty Corp., 195 Misc. 260, 89 N.Y.S.2d 763, affirmed 277 App. Div. 1020, 100 N.Y.S.2d 407; In re Cross Island Parkway, Nassau County, 171 Misc. 652, 14 N.Y.S. 2d 238. However, 'the relative priority of the lien of the United States for unpaid taxes is, as we said in United States v. Waddill, Holland & Flinn, Co., 323 U.S. 353, 356, 357, 65 S.Ct. 304, 306, 89 L.Ed. 294; * * * always a federal question to be determined finally by the federal courts. The state's characterization of its liens, while good for all state purposes, does not necessarily bind this court.' United States v. Acri, 348 U.S. 211, 213, 75 S.Ct. 239, 241, 99 L.Ed. 264. Whether attorney Goldstein's lien by state tests would be held to be choate, it is clear that under federal tests it is as compared to that of the Government inchoate. It was not established for the amount of the lien was contingent on the outcome of a trial in the state condemnation court to fix the amount of the award to be made to Pay-O-Matic for the property condemned. It was but a 'caveat of a more perfect lien to come' (United States v. Scovil, 348 U.S. 218, 220, 75 S.Ct. 244, 246, 99 L.Ed. 271) and is therefore subordinate to the federal tax lien; United States v. City of New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 370, 98 L.Ed. 520."

The views stated by the court in the Pay-O-Matic case are in accord with the views expressed by this Court in its memorandum decision. The briefs filed by the intervener with respect to the present motion have not persuaded me that I should change my views with reference to the priority of the Government's lien. Therefore,

It is ordered: That the intervener's motion must be, and the same hereby is, in all things denied. An exception is allowed.