Whitney C. RANDALL, Plaintiff,

v.

Eli F. COLBY and John Eli Colby, d/b/a Eli Colby Company; Iowa Builders, Inc.; United Home Bank & Trust Company; and Standard Glass & Paint Co., Defendants.

Eli F. COLBY and John Eli Colby, d/b/a Eli Colby Company, Cross-Petitioners.

v.

UNITED HOME BANK & TRUST COMPANY; Standard Glass & Paint Co.; Whitney C. Randall; and the United States of America, Defendants to Cross-Petition.

Civ. No. 741.

United States District Court
N. D. Iowa,
Central Division.
Jan. 10, 1961.

Floyd E. Ensign, Northwood, Iowa, for Whitney C. Randall, plaintiff and cross-defendant.

Dennis G. Drugswall, Lake Mills, Iowa, and Alan Loth, Fort Dodge, Iowa, for Eli F. Colby and John Eli Colby, defendants and cross-petitioners.

William B. Danforth (of Levinson & Danforth), Mason City, Iowa, for United Home Bank & Trust Co., defendant and cross-defendant.

**322**

F. E. Van Alstine, U. S. Dist. Atty., and Philip C. Lovrien and William R. Crary, Asst. U. S. Dist. Attys., Sioux City, Iowa, for United States, cross-defendant.

David J. Butler, Mason City, Iowa, for Standard Glass & Paint Co., defendant and cross-defendant.

GRAVEN, District Judge.

In the present case a partnership which was the owner of a tract of land entered into a contract with a building contractor, a corporation, to construct a warehouse thereon. The building contractor subsequently made an assignment to a bank of the sum due it under the contract as security for a loan. The building contractor failed to pay two subcontractors who had furnished material used in the construction of the warehouse and they filed mechanic's liens against the property of the owner. The building contractor was in default in the payment of taxes owing to the United States and two tax liens resulted. The action involves several controversies which will be later referred to.

Eli F. Colby and John Eli Colby are co-partners doing business under the firm name of Eli Colby Company. The office of the partnership is in Worth County, Iowa. The partnership will hereinafter be referred to as the Owner. The partnership had purchased a tract of land in Winnebago County, Iowa, from the Chicago and Northwestern Railroad Company. The Iowa Builders, Inc., is an Iowa corporation with its principal place of business at Mason City, Cerro Gordo County, Iowa. It was engaged in the business of constructing buildings. It will hereinafter be referred to as the Contractor. On June 29, 1955, the Owner and the Contractor entered into a written contract under which the Contractor agreed to furnish all the materials and labor necessary to construct a steel warehouse on the tract of land referred to. The specified contract price was $13,400. The contract provided for the payment of $3,000 upon the execution of the contract; the sum of $2,400 when the con-

crete work was done and steel was on the site; $7,000 from the First National Bank as soon as the Chicago and Northwestern Railroad Company furnished complete title to the Owner to the tract upon which the building was to be completed and $1,000 upon completion of the building. The contract specified that the Contractor was to complete the building in accord with the specifications and in complete conformance with good building practices, and that the work should be done in a workmanlike manner.

The contract specified that the Contractor was to complete the building not later than August 8, 1955. The Contractor commenced construction of the building promptly following the execution of the contract. On August 4, 1955, the Owner and the Contractor entered into another written contract for extra work and materials to be furnished by the Contractor in connection with the construction of the building. The amount specified to be paid for such extra work and materials was $446.76. The Owner paid the Contractor the $3,-000 due on the execution of the contract and the $2,400 due when the concrete work was done and steel was on the site. On November 4, 1955, the Owner paid to the Iowa Steel Erectors, Inc., the sum of $1,446.76 for materials furnished in connection with the building. All of the parties are agreed that the Owner is entitled to credit for that amount on the contract price. The Owner has made no payments upon the contract price other than the sums of $3,000, $2,400 and $1,446.76 just referred to. The two contracts referred to will hereinafter be referred to as the Construction Contract. The Contractor furnished the last of the work and materials for the building on October 12, 1955. It is the claim of the Contractor that it had completed the building in accordance with its contract on that date. It is the claim of the Owner that the Contractor never did complete the building in accordance with its contract. The Owner asserted and in this action asserts a claim for unliquidated damages to be set off against the con-

tract price for breaches of contract on the part of the Contractor.

On or about July 1, 1955, the Contractor entered into an oral contract with Whitney C. Randall, hereinafter referred to as Randall, under which Randall was to furnish materials to be used in constructing the building. Randall furnished the first of the materials on July 11, 1955. He furnished the last item of material on August 24, 1955. There is undisputedly owing Randall for the materials so furnished the sum of $3,233.64 with interest at five per cent from August 24, 1955, no part of which has been paid.

On August 15, 1955, the Commissioner of Internal Revenue duly assessed federal withholding and federal insurance contribution taxes for the second quarter of 1955 against the Contractor in the principal sum of $9,231.13. On August 16, 1955, notice of that assessment and demand for the payment was served upon the Contractor.

On September 19, 1955, the Contractor secured a loan of $3,000 from the United Home Bank & Trust Company of Mason City, Iowa, evidenced by a promissory note. The Contractor on the same date executed and delivered to that Bank a written assignment of the monies due it under the construction contract with the Owner. The United Home Bank & Trust Company will hereinafter be referred to as the Bank. On September 26, 1955, the Bank served notice of its assignment upon the Owner. There is undisputedly owing to the Bank on that loan the sum of $3,000 with interest at six per cent from September 19, 1955.

On or about September 6, 1955, the Contractor entered into an oral contract with the Standard Glass & Paint Company for the furnishing of certain materials to be used in connection with the building. The first of those materials was furnished on September 6, 1955, and the last of them on September 24, 1955. The Standard Glass & Paint Company will hereinafter be referred to as Standard. There is undisputedly due Standard for the materials so furnished the

sum of $69.41, with interest at the rate of five per cent from September 24, 1955, no part of which has been paid.

On November 8, 1955, the United States filed notice of its tax lien in the office of the County Recorder of Cerro Gordo County, Iowa, for the federal taxes due from the Contractor for the second quarter of 1955 which had been assessed by the Commissioner of Internal Revenue on August 15, 1955. On November 15, 1955, the Commissioner of Internal Revenue assessed federal withholding and federal insurance contributions taxes against the Contractor for the third quarter of 1955 in the principal sum of $9,302.56. On November 13, 1955, the Government served notice of levy upon the Owner for the tax assessments against the Contractor for both the second and third quarters of 1955. On November 15, 1955, notice of the assessment of the assessments against it for the third quarter of 1955 was served upon the Contractor. On January 12, 1956, the Government filed notice of its tax lien for the federal taxes of the Contractor for the third quarter of 1955 in the office of the County Recorder of Cerro Gordo County, Iowa. It will hereinafter appear that the amount claimed by the Government on its first tax lien is in excess of any possible amount it may recover herein. Therefore, only that lien will be hereinafter referred to, and it will be referred to as the Government's tax lien.

On November 29, 1955, Randall filed a mechanic's lien against the property of the Owner in the office of the Clerk of Court of Winnebago County, Iowa, in the principal sum of $3,233.64. On the same day he gave the Owner written notice of the filing of the lien. On December 16, 1955, Standard filed a mechanic's lien against the property of the Owner in the office of the Clerk of Court of Winnebago County, Iowa, in the principal sum of $69.41. On December 30, 1955, Standard gave the Owner written notice of the filing of the lien.

On November 29, 1955, Randall commenced an action in the District Court

of Iowa in and for Winnebago County for the foreclosure of his mechanic's lien. The original defendants to that action were the Owner, the Contractor, the Bank, and Standard. By cross-petition (complaint) the United States became a party to the action. Upon being made a party, the United States removed the action to this Court. The United States will hereinafter be referred to as the Government.

On December 3, 1955, the Contractor filed a mechanic's lien against the property of the Owner in the office of the Clerk of Court of Winnebago County, Iowa, in the principal sum of $7,098.08. On December 6, 1955, the Contractor executed an assignment of that lien to the Bank. That assignment was filed for record in the office of that Clerk on December 8, 1955.

There is a controversy between the Government, the Bank and the mechanic's lienholders as to their rights in and to the balance alleged to be due on the contract price from the Owner. There is related to that controversy a controversy as to the claimed breaches of contract on the part of the Contractor and damages for such breaches. There is also a controversy between the Owner and the mechanic's lienholder, Randall. It is the claim of the latter that he postponed the filing of his mechanic's lien at the request of the Owner. That controversy also enters into the controversy as to the rights of the parties in and to the alleged balance due on the contract price from the Owner.

The first matter to be passed upon is the matter of the claimed breaches of the contract on the part of the Contractor and the claim of the Owner for damages in connection therewith. As hereinafter noted, it is the claim of the Owner that the Contractor never did complete its contract in accord with the terms thereof. It is the claim of the Owner that the breaches of contract on the part of the Contractor required the former to make the following expenditures:

| | | |
|---|---|---|
| Aug. 31, 1955 — Wendte Hardware, Lake Mills, Iowa | $ | 3.05 |
| Sept. 19, 1955 — Randall Transit Mix, Northwood, Iowa | | 158.88 |
| Oct. 6, 1955 — Culver-Hahn Electric Company, Mason City, Iowa | | 16.67 |
| Oct. 26, 1955 — S. G. Rierson Building Supplies | | 460.17 |
| Nov. 3, 1955 — Lake Mills Lumber Co., Lake Mills, Iowa | | 30.28 |
| Nov. 14, 1955 — Kelly-Howe-Thompson Co., Duluth, Minnesota | | 347.72 |
| Nov. 21, 1955 — Iowa Steel Erectors, Inc. | | 173.76 |
| Dec. 1, 1955 — A. A. Saxerud & Son, Lake Mills, Iowa | | 16.30 |
| Dec. 26, 1955 — Nelson Welding Shop, Lake Mills, Iowa | | 25.60 |

The Owner also claims damages in the sum of $175 for a claimed defective door. The total amount of unliquidated damages claimed by the Owner is $1,407.43.

The Court finds that the Contractor did commit breaches of its contract with the Owner. The Court finds that because of the said breaches the Owner is entitled to the damages next referred to. The Court finds that the Owner is entitled to damages for all of the items of expenditure above set forth, except for the item of $158.88 paid to the Randall Transit Mix on September 19, 1955, and the item of $16.67 paid to Culver-Hahn Electric Company on October 6, 1955. The Court further finds that the Owner is entitled to damages for the defective door in the sum of $125 instead of the $175 claimed. The total amount of damages to which the Owner is entitled is the sum of $1,181.88. It was heretofore noted that the specified contract price was the sum of $13,846.76 and the payments made thereon by the

Owner amounted to $6,846.76. This left a prima facie of $7,000 due on the contract. That balance was subject to the claims of the Owner for damages for breaches of contract which this Court has now determined to be in the amount of $1,181.88. Deducting the sum of $1,181.88 from the $7,000 leaves a balance of $5,818.12, which is the amount in controversy.

The next matter to be considered is the matter of the filing of Randall's mechanic's lien. As heretofore noted, he furnished the last of the material for the building on August 24, 1955, and filed his mechanic's lien on November 29, 1955, which was more than sixty days after the furnishing of the last material. In that connection it is necessary to consider several Iowa statutes relating to mechanic's liens.

Section 572.2, Code of Iowa 1958, I.C. A., provides, in part, as follows:

"Every person who shall furnish any material or labor for * * * any building * * * shall have a lien upon such building * * * and land belonging to the owner on which the same is situated * * *."

Under Section 572.8, Code of Iowa 1958, I.C.A., a related statute, it is required that one who wishes to avail himself of a mechanic's lien shall file a verified statement or account and a description of the property against which the lien is asserted in the office of the Clerk of Court.

Section 572.9, Code of Iowa 1958, I.C. A., provides, in part, as follows:

"The statement or account required by section 572.8 shall be filed by a principal contractor within ninety days, and by a subcontractor within sixty days, from the date on which the last of the material was furnished or the last of the labor was performed. * * *"

Sections 572.10 and 572.11 relate to the perfecting of mechanic's liens after sixty days, and Sections 572.13 and 572.14 relate to the liability of the owner in regard to payments to the principal contractor and will be later referred to.

As heretofore noted, Randall furnished the last of his materials for the building on August 24, 1955. Therefore, the sixty-day filing period provided for in Section 572.9, above referred to, would expire on October 24, 1955. It was heretofore noted under the contract between the Owner and the Contractor that $7,000 was to be paid the Contractor from the First National Bank as soon as the Chicago and Northwestern Railroad Company, the Owner's vendor, furnished complete title to the Owner.

Shortly after Randall commenced to furnish the materials he was informed by the Contractor that the Owner was arranging for a loan with the First National Bank of Mason City upon the property in question, the proceeds of which were to be applied upon the contract price. The Contractor directed Randall to furnish copies of his statements to both it and the First National Bank. Both before and after Randall had furnished all of the materials, he sent copies of his statements to the First National Bank as directed. He did not receive any payments in response to his statements. After he had completed the furnishing of all the materials, he made inquiry of the First National Bank as to the matter of payment and was informed that the title difficulty had not as yet been straightened out. Soon after Randall had completed the furnishing of the materials, he consulted with the late O. J. Wardwell, an attorney at Northwood, Iowa. Mr. Wardwell advised him as to the sixty-day period for the filing of mechanic's liens by materialmen under the Iowa Mechanic's Lien Act. Mr. Wardwell prepared a statement for a mechanic's lien and advised that it be filed. On October 14, 1955, which was shortly before the expiration of the sixty-day period, Randall called Mr. Eli Colby, one of the partners, by telephone. Randall told him he had not been paid and that he was about to file a mechanic's lien. Mr. Colby told him that the filing of the lien "would really upset things" and "would blemish the title" so that the First National Bank would not complete

the loan. Mr. Colby requested him to withhold the filing of a mechanic's lien. In response to that request Randall directed Mr. Wardwell to withhold the filing of the lien, and the filing of the lien was withheld beyond the sixty-day period pursuant to the request of Mr. Colby. On November 25, 1955, which was after the expiration of the sixty-day period, Mr. Randall again talked to Mr. Colby by telephone. Mr. Colby told him he was confident that Randall's claim would be paid within a few days and that the filing of a mechanic's lien would "upset things." Randall, not receiving payment within the next few days, filed his mechanic's lien on November 29, 1955, and on the same day gave the Owner written notice of such filing. It seems clear and the Court finds that Randall was about to file a mechanic's lien against the premises of the Owner within the sixty-day period but withheld the filing of the same past the sixty-day period by reason of the request of the Owner. It is the holding of the Court that the Owner is estopped from asserting that Randall's mechanic's lien against the premises was impaired or the amount of his claim was subject to being diminished because it was not filed within the sixty-day period. See Cedar Rapids Sash & Door Company v. Heinbaugh, 1918, 183 Iowa 1236, 168 N.W. 270, 274.

It appears that the First National Bank did not complete the loan to the Owner. It is not claimed that the non-completion of the loan was due to fault on the part of the Owner.

In view of the holding of the Court on the issue of estoppel, the situation is that, as between the Owner and Randall, the latter has a valid first lien against the premises of the Owner for the full amount of his claim and is entitled to the foreclosure of his lien. Since his lien is apparently a first lien against the premises, and the property has a value apparently well in excess of the amount of his lien, he would not necessarily be further concerned. However, it is a matter of concern to the Owner as to whether he may discharge the lien out of the unpaid contract balance. It is also a matter of concern to the Government and the Bank whether the Owner may do so.

The situation as between the Owner, the Government and the Bank has to be considered. The situation as between the Owner and the Government will be the first situation considered. That situation requires the consideration of several rules of law relating to Federal tax liens.

This Court considered certain phases of Federal tax liens in the cases of Wolverine Insurance Company v. Phillips, D.C.1958, 165 F.Supp. 335, appeal dismissed, 8 Cir., 1960, 283 F.2d 518; Noltze Motor Company v. Burrows-Moore Pontiac, D.C.1958, 157 F.Supp. 593; Beeghly v. Wilson, D.C.1957, 152 F.Supp. 726; and Mason City & Clear Lake Railroad Company v. Imperial Seed Company, D.C. 1957, 152 F.Supp. 145.

■■ Section 6321, Title 26 U.S.C.A., relating to Federal taxes, provides, in part, as follows:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

Section 6322, Title 26 U.S.C.A., provides as follows:

"Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed is satisfied or becomes unenforceable by reason of lapse of time."

The lien given by Section 6321 is very broad and comprehensive. It attaches to all property and rights to property which are subject to ownership and which can be transferred and which can be brought under the dominion of the Court by its usual processes; it attaches not only to land and tangible personal property but also to claims, de-

mands, and causes of action which the taxpayer can assert against third persons. Bank of Nevada v. United States, 9 Cir., 1958, 251 F.2d 820, certiorari denied, 1958, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813; United States v. Barndollar & Crosbie, 10 Cir., 1948, 166 F.2d 793; Citizens State Bank of Barstow, Tex. v. Vidal, 10 Cir., 1940, 114 F.2d 380, 382, 383. See also cases cited in Beeghly v. Wilson, D.C.N.D.Iowa 1957, 152 F. Supp. 726, 729, 730. The lien is a continuing liability and will attach to obligations which come into existence thereafter. Glass City Bank of Jeanette, Pa. v. United States, 1945, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56.

There is not involved in this case the question of competition between a mechanic's lien and Federal tax lien as to the real estate of the Owner. That subject is discussed in the case of Wolverine Insurance Company v. Phillips, D.C.N.D. Iowa 1958, 165 F.Supp. 335, 344, 345. In the present case the Government claims no lien against the real estate of the Owner. The Government claims a prior lien upon the unpaid balance on the Construction Contract which has been determined herein to be the sum of $5,818.12.

It is not uncommon for a contractor who has entered into a construction contract to default in the performance of that contract. In such a situation, it is not uncommon for the contractor to have left unpaid those who have furnished labor and materials for the project which was the subject matter of the contract. In many defaulted construction contracts there is present the feature of the contractor having furnished a bond with surety in connection with the contract. Where a contractor defaults in the performance of his contract, there is commonly present the feature of the contractor having failed to pay his Federal taxes and of the Government asserting a lien against the unpaid balance due under the contract. There has been much litigation in connection with the status of Federal tax liens in connection with the unpaid balance due under a defaulted construction contract. Very frequently the litigation is between the Government and the surety on the contractor's bond occasioned by the payments made by the surety in connection with the defaulted contract. In such litigation, both the Government and the surety make conflicting claims to the balance due on the defaulted contract. The surety's claim to such balance may be based upon several theories. The case of Wolverine Insurance Company v. Phillips, supra, had to do with the conflicting claims of the Government and the surety on the bond of a defaulting contractor as to the unpaid balance on the contract.

In the present case the only property of the Contractor to which the Government's lien could attach was the contractual obligation of the Owner to the Contractor. On June 20, 1960, the United States Supreme Court rendered two decisions which were of great importance in this field of the law. Those decisions were rendered in the cases of Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365, and United States v. Durham Lumber Company, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371. The first case will hereinafter be referred to as the Aquilino case and the second case as the Durham case. The situation in the Aquilino case was as next stated.

In December, 1951, and March, 1952, the Director of Internal Revenue entered assessments against a contractor for delinquent Federal taxes. On October 31, 1952, the Director filed notice of tax liens in the office of the City Clerk in the city wherein the contractor maintained its principal place of business. In July or August, 1952, the contractor entered into a contract to remodel a restaurant for an owner. The contractor entered into contract with subcontractors for the furnishing of labor and materials for the remodeling. The subcontractors completed their contracts but were not fully compensated. They then filed mechanic's liens against the owner's premises and commenced actions to foreclose those liens. There was a balance owing by the owner on the construction con-

tract. That balance was paid into court. The Government claimed that balance by virtue of its tax lien. The New York Court of Appeals held the Government had priority as to that balance over the subcontractors by virtue of its tax lien. The United States Supreme Court granted certiorari and reviewed the case. On review that Court vacated the judgment of the New York Court of Appeals. That Court stated (at pages 512–516 of 363 U.S., at page 1280 of 80 S.Ct.):

"The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property * * * sought to be reached by the statute.' Morgan v. Commissioner, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 585. Thus, as we held only two Terms ago, Section 3670 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law * * *.' United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135. However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.' * * *

"Petitioners contend that the New York Court of Appeals did not make its determination in the light of these settled principles. Relying upon the express language of Section 36–a of the Lien Law and upon a number of lower New York court decisions interpreting that statute, petitioners conclude that the money actually received by the contractor-taxpayer and his right to collect amounts still due under the construction contract constitute a direct trust for the benefit of subcontractors, and that the only property rights which the contractor-taxpayer has in the trust are bare legal title to any money actually received and a beneficial interest in so much of the trust proceeds as remain after the claims of subcontractors have been settled. The Government, on the other hand, claims that Section 36–a merely gives the subcontractors an ordinary lien, and that the contractor-taxpayer's property rights encompass the entire indebtedness of the owner under the construction contract.

"This conflict should not be resolved by this Court, but by the highest court of the State of New York. We cannot say from the opinion of the Court of Appeals that it has been satisfactorily resolved. We find no discussion in the court's opinion to indicate the nature of the property rights possessed by the taxpayer under state law. Nor is the application to be made of federal law clearly defined. We believe that it is in the interests of all concerned to have these questions decided by the state courts of New York. We therefore vacate the judgment of the Court of Appeals, and remand the case to that court so that it may ascertain the property interests of the taxpayer under state law and then dispose of the case according to established principles of law."

The Durham case will be next considered. In that case a contractor early in 1954 entered into a contract to construct buildings. The work was completed on July 15, 1954. Because the owners disputed the amount due under the contract, payment to the contractor was delayed. The contractor, in constructing the buildings, had secured labor and material from subcontractors. The contractor failed to pay them. On

August 13, 1954, the Government made an assessment against the contractor for unpaid Federal taxes. Such assessment gave the Government a lien against the contractor. The contractor subsequently went into bankruptcy. The owner then paid the balance due under the construction contract into court. The Government and the subcontractors made conflicting claims to that balance. The United States Court of Appeals for the Fourth Circuit held that the subcontractors were entitled to payment of their claims out of that balance before the Government could satisfy its tax lien. The United States Supreme Court granted certiorari and reviewed the case and affirmed the decision of the Court of Appeals. That Court stated (at pages 524–527 of 363 U.S., at page 1283 of 80 S.Ct.):

> "In affirming the judgment of the District Court, the Court of Appeals stated that the nature and extent of the general contractors' property rights, to which the tax lien attached, must be ascertained under state law. The court then undertook an extensive analysis of the relevant North Carolina statutes and cases. It found that the North Carolina law provides as follows: Subcontractors who have not been paid by the general contractor have a direct, independent cause of action against the owner to the extent of any amount due under the general construction contract, and any money owed by the owner under the construction contract must first be used to satisfy subcontractors' claims of which the owner has notice. Moreover, to insure that the owner will receive notice of outstanding subcontractors' claims, the North Carolina statute, N.C.Gen.Stat., 1950, § 44–8, requires the general contractor, before receiving any payment, to furnish the owner with a statement of all sums due subcontractors, and if the general contractor fails to supply the required statement, he is guilty of a misdemeanor. N.C.Gen.

Stat., 1950, § 44–12. Finally, the court found further evidence of the direct and independent nature of the subcontractors' claims against the owner in N.C.Gen.Stat., 1950, § 44–9, which provides that should the owner pay the general contractor after receiving notice of a subcontractor's claim, he will nevertheless be liable to the subcontractor to the extent of the amount which was due under the construction contract at the time notice was received.

> "Based upon these considerations, the Court of Appeals held that, under North Carolina law, the general contractor did not have a property interest in the face amount, as such, of the general construction contract. Specifically, the court said that 'except to the extent the claim of the general contractor exceeds the aggregate of the claims of the subcontractors, the general contractor has no right which is subject to seizure under the tax lien.' Id., [257 F.2d] at [page] 574. Therefore, concluded the court, since under North Carolina law the taxpayers possessed merely a right to the residue of the fund, and since the Government's tax lien attached to the property interests of the taxpayers as defined by state law, the Government can recover only 'so much of the construction price as will remain unpaid after the owners have deducted a sum sufficient to pay the subcontractors.' Id., [257 F.2d] at [page] 575.

> "The Court of Appeals was correct in asserting that the Government's tax lien attached to the taxpayers' property interests in the fund as defined by North Carolina law. Aquilino v. United States, 363 U.S. at p[ages] 509, 513 [80 S.Ct. at page 1277, 1285; 4 L.Ed.2d 1365]; United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057; cf. Morgan v. Commissioner, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 585. It is suggested that the courts of North Carolina have never specifically de-

scribed the nature of the property rights created by the North Carolina statutes involved in this case, and that the Court of Appeals' interpretation of those statutes is probably incorrect. However, where '[t]he precise issue of state law involved * * * is one which has not been decided by the * * * [state] courts,' this Court has said that, '[i]n dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable.' Proper [Propper] v. Clark, 337 U.S. 472, 486–487 [69 S. Ct. 1333, 1341–1342, 93 L.Ed. 1480]. Since the Court of Appeals is much closer to North Carolina law than we are, and since we cannot say that the court's characterization of the taxpayers' property interests under that law is clearly erroneous or unreasonable, the judgment is *affirmed.*"

In footnote 4 the Court stated:

"This case points up the distinction we drew in Aquilino. The facts here show how it simply begs the question to suggest that the principle of the lien-priority cases is somehow subverted or evaded by recognizing that what constitutes the taxpayer's property in the first place is a question of state law. The facts show, too, that it does not promote clarity to substitute, for the property interests created by state law, a rule of federal property law, the main feature of which seems to be an inquiry into what the consequences would be if state law were different from what it in fact is. It is said that we should regard the subcontractor's interest as equivalent to a lien on the general contractor's claim against the owner, overlooking the fact that the law of North Carolina, as interpreted by the Court of Appeals, indicates that there is no such claim. If we are to equate the subcontractor's interest with something it is not, it would be much more appropriate, in terms of similarity, to equate it with the usual mechanic's lien of a subcontractor on the owner's property being improved—which of course is not the general contractor's property, and which could not be taken by the United States under a lien against the general contractor. This only points up the lack of precision and content in the proposed federal definition of property. See also Fidelity & Deposit Co. of Md. v. New York City Housing Auth., 2 Cir., 241 F.2d 142 cited with approval in United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135."

It would seem that in a case involving controversies relating to Federal tax liens where a Federal Court has to ascertain the nature and extent of property rights under state law, it has a duty similar to that imposed upon it in a Federal Court case in which jurisdiction is based upon diversity of citizenship.

■ Under the teaching of the two cases just discussed, it seems clear that where the Government has a tax lien against a delinquent contractor-taxpayer that lien only attaches to that part of the unpaid portion of the contract price to which the tax-delinquent contractor would be entitled under the applicable state law. In the Durham case the word "residue" is used. It seems clear that the two cases discussed establish the so-called "residue" rule. That rule would seem to be that a Federal tax lien only attaches to the residue or the net amount of the unpaid balance under the contract to which the delinquent contractor-taxpayer would have had an enforceable claim, except for the lien.

■ Certain phases of the situation as between the Owner and the Contractor will next be considered. The Government's tax lien came into existence on August 15, 1955. The assignment by the Contractor to the Bank of the amounts due him under the contract was made on

September 19, 1955. On both dates the building was still under construction and the amount payable to the Contractor was undetermined. The Contractor committed breaches of his contract for which the Owner asserted and asserts a claim for unliquidated damages. The amount of those damages when determined would go to the reduction of the contract price. The Government and the Bank controverted the Owner's claim for damages. However, neither contends that the amount of such damages when determined is not properly chargeable by the Owner against the unpaid balance. In the present case, the Contractor never did complete the building in accordance with the provisions of its contract. However, under the Iowa law, the Contractor, having substantially performed its contract, would be entitled to recover the balance of the contract price less the value of defects in performance. Farrington v. Freeman, Iowa 1959, 99 N.W.2d 388, 391.

█ If a contractor who has contracted to build a building neglects to pay the subcontractors for labor and materials supplied by them in connection with the construction of the building, and such subcontractors acquire valid liens against the property of the owner, the owner may properly, as against the contractor, apply the unpaid balance under the contract to the discharge of such liens even though there may be an outstanding Federal tax lien against the contractor, Wolverine Insurance Company v. Phillips, D.C.N.D.Iowa 1958, 165 F.Supp. 335, 343; the reason being that the owner is not compelled to stand by and see his property sold under liens which it was the duty of the contractor to pay.

█ One of the controversies in this case arises because the two mechanic's lienholders here involved did not file their liens within sixty days. It was heretofore noted that the Owner is held to be estopped as against the mechanic's lienholder Randall from attacking the lien on that ground and that Randall was entitled to foreclose his lien. So the result to the Owner is the same as though the lien had been filed within the sixty-day period. He is now faced with the threat of foreclosure on a claim and lien that should have been paid by the Contractor. It would seem clear that neither the Government nor the Bank is in any different situation than it would have been had the Owner not secured a postponement of the filing of the lien until after the sixty-day period, because if the Owner had not secured such postponement Randall would have filed the lien within the sixty-day period and the Owner, under the rule previously stated, would be entitled to discharge the lien out of the unpaid balance. So, therefore, neither the Government nor the Bank can successfully assert that the Owner, by securing postponement of the filing of the lien, impaired their situation.

█ In the case of Randall there is an additional feature which is of importance. While Randall did not file his mechanic's lien within sixty days after he furnished the last of the materials, he did file and perfect it within sixty days after October 12, 1955. The Contractor in the mechanic's lien filed by it stated that it completed the building on October 12, 1955. Under the Iowa Mechanic's Lien Act, a subcontractor who has not filed his lien within sixty days from the date he furnished the last of the material does not lose the right to file a mechanic's lien against the property of the owner. Section 572.10, Code of Iowa 1958, I.C.A., provides, in part, as follows:

"After the lapse of the sixty days prescribed in section 572.9, a subcontractor may perfect a mechanic's lien by filing his claim with the clerk of the district court and giving written notice thereof to the owner * * *"

Section 572.11, Code of Iowa 1958, I.C.A., provides, in part, as follows:

"Liens perfected under section 572.10 shall be enforced against the property * * * only to the extent of the balance due from the owner to the contractor at the time of the service of such notice * * *."

Section 572.13, Code of Iowa 1958, I.C.A., provides as follows:

"No owner of any building, land, or improvement upon which a mechanic's lien of a subcontractor may be filed, shall be required to pay the original contractor for compensation for work done or material furnished for said building, land, or improvement until the expiration of sixty days from the completion of said building, or improvement unless the original contractor shall furnish to the owner:

"1. Receipts and waivers of claims for mechanics' liens, signed by all persons who furnished any material or performed any labor for said building, land, or improvement, or

"2. A good and sufficient bond to be approved by said owner, conditioned that said owner shall be held harmless from any loss which he may sustain by reason of the filing of mechanics' liens by subcontractors."

There is some question as to just when the building in question was completed within the purview of Section 572.13 just set out. It was and is the claim of the Owner that the Contractor never did complete the building in accord with the provisions of the contract. It appears that the last items of work and materials were furnished by the Contractor on October 12, 1955, and that it claims the building was completed at that time. At least at that time the building was completed so far as any further activity on the part of the Contractor was concerned, which might give rise to mechanic's liens in favor of subcontractors. Thus the date of October 12, 1955, will be taken as the date for the completion of the building within the purview of Section 572.13.

■ Under the provisions of the Iowa Mechanic's Lien Act there are two sixty-day periods which are of significance. A subcontractor has sixty days after he has furnished the last of his material in which to file his mechanic's lien. The owner is authorized by law to withhold payment from the contractor sixty days after the completion of the building. If a subcontractor has not filed his lien within sixty days after he furnished the last of his material, he may nevertheless perfect a mechanic's lien against the owner's premises to the extent that the owner has withheld payment of the contract price from the contractor. If the owner exercises the right given him by statute to withhold payment from the contractor for sixty days after the completion of the building in an amount equal to or in excess of the amount of the subcontractor's lien, the subcontractor has a lien against the owner's premises to the full amount of his lien.

■ It seems clear that under the Iowa Mechanic's Lien statutes referred to, even apart from the issue of estoppel, the claim of Randall based upon his mechanic's lien is properly payable by the Owner out of the balance of the contract price ahead of the Government and this Court so holds.

■ It was heretofore noted that Standard did not file its mechanic's lien until December 16, 1955, and did not perfect its claim to a mechanic's lien by giving written notice to the Owner until December 30, 1955, both of which dates were subsequent to the sixty-day period following the completion of the building. Under Section 572.27, Code of Iowa 1958, I.C.A., there is a two-year statute of limitations applicable to the foreclosure of mechanic's liens; the period to begin upon the expiration of the sixty or ninety-day period for filing liens under Section 572.9. Therefore, Standard, as a subcontractor, could file a mechanic's lien within two years of September 24, 1955, the date on which it furnished the last of the materials. The question is then presented as to what is the situation where a mechanic's lien is filed within the limitation period but after the sixty days following the completion of the

building where the owner has not paid the full balance of the contract price and the Government is the holder of a tax lien against the contractor. Under the rule laid down in the Aquilino and Durham cases, the nature of the contractual obligation existing between the owner and the contractor is determined by state law, but the legal consequences arising out of the intervention of a Federal tax lien against the contractor is determined by Federal law. The contentions of Standard and the Government require a consideration of certain cases. For some time prior to the decisions of the United States Supreme Court in the Aquilino and Durham cases, a number of courts, in passing upon questions growing out of a Federal tax lien assessment and a tax-delinquent contractor, adopted and followed what is referred to as the "no debt" rule. See cases cited in Wolverine Insurance Company v. Phillips, D.C. N.D.Iowa 1958, 165 F.Supp. 335, 348, 349. See also Central Surety & Insurance Corporation v. Martin Infante Company, Inc., 3 Cir., 1959, 272 F.2d 231; Atlantic Refining Company v. Continental Casualty Company, D.C.1960, 183 F. Supp. 478; First National Bank In Yonkers v. City of New York, D.C.1959, 177 F.Supp. 175; General Insurance Company of America v. Ted Price Construction Company, D.C.1959, 175 F. Supp. 261. The leading case supporting the "no debt" rule is the case of Fidelity & Deposit Company v. New York City Housing Authority, 2 Cir., 1957, 241 F.2d 142. In footnote 4 of the opinion in the Durham case there appears this statement: "See also Fidelity & Deposit Co. of Md. v. New York City Housing Auth., 2 Cir., 241 F.2d 142, cited with approval in United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed. 1135." While the United States Supreme Court in the Aquilino and Durham cases does not make use of the term "no debt," the teaching in those cases encompasses the "no debt" rule. In the Durham case the Court affirmed the decision of the United States Court of Appeals, 257 F.2d 570. That Court of Appeals stated (at page 574):

" * * * To the extent that the owners may be allowed to take credit for the amount of their [subcontractors'] claims in any settlement with the general contractor, the existence of the claims are relevant to an appraisal of the worth of the claim of the general contractor. * * * "

Standard relies strongly upon the fairly recent case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, 1958, 249 Iowa 1364, 92 N.W.2d 638, commented on in 44 Iowa Law Review 814 (1959). In that case on March 25, 1955, a contractor entered into a contract with an oil company, as owner, for the completion of a service station at Sioux City, Iowa. The service station was completed in October, 1955. Prior to January 1, 1956, the owner paid the contractor all but the sum of $3,442 on the contract price. On February 15, 1956, an assessment was made and a lien credited against the contractor for unpaid Federal taxes. The contractor failed to pay a number of subcontractors. They filed mechanic's liens against the premises of the owner. All of the liens were filed more than sixty days after the last material had been furnished and more than sixty days after the building had been completed. One of the mechanic's lienholders commenced foreclosure of its mechanic's lien and a number of other mechanic's lienholders were made parties to that action. One of the issues in the case was the status of the Government's tax lien as to the unpaid balance. The Government was not a party to the action. The unpaid balance was sufficient to pay the claims of the mechanic's lienholders who were parties to the action but it was not sufficient to pay both those claims and the Government's tax lien. The decree of the trial court in that case covered a number of matters. It decreed that the Government lien was inferior to the claims of two of the mechanic's lienholders but superior to the

claims of the other two mechanic's lien-holders. On appeal, the portion of the decree giving the Government's lien priority over the claims of two of the mechanic's lienholders was reversed, and those claims were given priority over the Government's lien. The Iowa Supreme Court discussed at some length the "no debt" rule in relation to tax liens against tax-delinquent contractors and purported to apply that rule. It was heretofore noted that subcontractors may file and perfect their liens within a two-year period but that any liens filed and perfected after the expiration of sixty days from the furnishing of the material are, under Section 572.11, liens against the premises of the owner "only to the extent of the balance due" from the owner to the contractor at the time the lien is perfected. In the case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, supra, the Iowa Supreme Court stated (at page 642 of 92 N.W. 2d): "Interpretation of Section 572.11 as to meaning of words 'balance due' creates a question of first impression." In that case, apart from the intervention of the Government tax lien, there being a balance due the contractor at the time the mechanic's liens in question were filed, it is clear that the lienholders would have had the right to be paid out of the balance due and the owner would have had the right to pay them out of the balance due. However, in that case a Government tax lien did come into evidence before the mechanic's liens were filed. Under the Federal law, in order for a Federal tax lien to attach to any portion of the balance on the contract, there must have been at some time a right on the part of the contractor to demand and receive such portion.

It sometimes happens that even though the sixty-day period following the completion of a building has expired and no mechanic's liens are on file the owner does not make final settlement with the contractor. This may be due to the owner asserting a claim for damages against the contractor, the inability of the owner to raise the necessary funds, or because of conflicting claims to the balance due on the contract. In the case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, supra, no mechanic's liens were on file at the expiration of sixty days following the completion of the Sioux City building. The owner did not make payment of the balance due on the Sioux City contract following the end of that period apparently because of a controversy growing out of another contract. The contractor had completed a building at Logan, Iowa, under another contract and there were unpaid mechanic's liens in connection with that building. The owner claimed the right to apply the balance due on the Sioux City contract on the mechanic's liens against the Logan property. The Iowa Supreme Court held that it could not so do. Thus, the situation, in reality, was that at the end of the sixty-day period following the completion of the building no mechanic's liens were on file and there was apparently a balance due the contractor on the contract price.

In the present case at the expiration of the sixty-day period following the completion of the building, only one mechanic's lien was on file, that of Randall. This Court has heretofore held that the Owner was entitled to credit upon the contract price for the amount of the Randall lien and for its damages for breach of contract. However, after allowing credit for those items, there was still a balance remaining unpaid on the contract price. In the present case, so far as the claim of Standard is concerned, and in the Beane Plumbing & Heating Company case, so far as the mechanic's liens were concerned, there is the same question involved. That question is as follows: Where a contractor has completed the construction of a building under a contract with the owner and more than sixty days have elapsed since completion, and no mechanic's liens are on file, does the contractor have the right to demand and receive the balance due on the contract? If the contractor does have

such right, then, of course, the owner could pay such balance without incurring liability to subcontractors who might file mechanic's liens after the payment had been made.

It seems clear that under the Federal law once a right arises in favor of a contractor against whom a Federal tax lien is outstanding to a portion of the contract price, the tax lien attaches to that portion immediately. It would also seem clear that once a Federal tax lien has attached to such a portion it is no longer a part of the balance "due" the contractor but is "due" to the Government. Under the rule of the Aquilino and Durham cases, in order for a Federal tax lien against a contractor to attach to the contract price there must have been a time at which the owner is not entitled to take credit on the contract price for the claims of the subcontractors. On the other hand, if there was a time when the owner was not entitled to take credit for claims of subcontractors out of the contract price and the contractor against whom a tax lien was outstanding would have had the right, save for the tax lien, to demand and receive payment of the balance of the contract price, then the tax lien would attach to the balance due on the contract price.

There inheres in this phase of the present case the question of the rights, if any, of a subcontractor who has furnished materials for a building but who has not filed a mechanic's lien within the sixty-day period following the completion of the building but files it subsequent to the time the owner has made payment to the contractor following the expiration of the sixty-day period. Under Section 572.11, the lien would only be a lien against the owner's property for the "balance due" the contractor. Since, in the situation just stated, there would be no balance due the contractor at the time the lien was filed, it would seem that the lien would be of no efficacy. Under Section 572.13, the owner is not required to pay the contractor until sixty days after the completion of the building. That Section would seem to imply that after

the expiration of the sixty-day period the owner could properly pay the contractor the balance due on the contract price if no mechanic's liens were on file.

Some lack of clarity has arisen in connection with the questions just discussed because of the decision of the Iowa Supreme Court in the case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, supra. In that case the Iowa Supreme Court held that mechanic's liens of subcontractors filed more than sixty days after the completion of the building were superior to the claim of the Government on a tax lien which came into existence after the expiration of the sixty-day period following the completion of the building and before the filing of mechanic's liens by the subcontractors.

Under the Aquilino and Durham cases, the Federal Courts, in cases involving Federal tax liens, are required to follow local state law as to the property rights created under that law, but such Courts are not required to follow local state laws as to the legal consequences of federal laws when applied to those rights. One of the legal consequences would relate to the matter of priority between those liens and competing state created claims. In the case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, supra, the Iowa Supreme Court does not discuss or state just what rights, if any, a subcontractor would have who furnished materials for a building, but who did not file a mechanic's lien within the sixty-day period following the completion of the building, but filed it subsequent to the time the owner has made payment to the contractor following the expiration of the sixty-day period. This is the pivotal question in this case so far as priority between the Government's tax lien and Standard's mechanic's lien.

The earlier Iowa case of Cedar Rapids Sash & Door Company v. Heinbaugh, 1918, 183 Iowa 1236, 168 N.W. 270, is of interest in this connection. In that case a subcontractor furnished material for a contractor who had constructed a build-

ing for the owner. At that time the Iowa Mechanic's Lien Act required a subcontractor to file his mechanic's lien within thirty days after the last item of material was furnished. The Act also provided that a subcontractor, in order to preserve his lien against the owner, was required to serve notice upon the owner within thirty days after the completion of the building. The subcontractor did not file his mechanic's lien within thirty days following the furnishing of the last of the material nor serve notice upon the owner within thirty days after completion of the building. Following the expiration of the thirty-day period following the completion of the building, the owner made final settlement with the contractor. At the time of the settlement the owner knew the subcontractor had furnished material for the building and had not been paid. Following the final settlement, the contractor sought to foreclose a mechanic's lien against the owner's property. The lower court dismissed the foreclosure and on appeal the Iowa Supreme Court affirmed. It stated (at page 271 of 168 N.W.):

"* * * Therefore it would seem that after the 30 days no written notice having been served upon the owner as required by section 3093, the owner is at liberty to settle with the principal contractor, or to dispose of the contract money in any lawful way, without regard to the claims of the subcontractor. * * *"

The Court held that the situation was not changed by the fact that the owner at the time he had made full settlement with the contractor knew that the subcontractor had furnished materials for the building and that he had not been paid. The Court stated (at page 272 of 168 N.W.):

"The statute requires that the subcontractor serve the owner with written notice. This is explicit. Oral notice or constructive notice cannot be substituted for the plain requirements of the statute. * * *"

The Iowa Supreme Court, however, in the case of Beane Plumbing & Heating Company v. D-X Sunray Oil Company, supra, did hold that the belatedly filed mechanic's liens did have priority over the Government's pre-existing tax lien. As heretofore noted, the Government was not a party to that litigation and, therefore, the Government was not heard on the question of the priority of its tax lien. At the time of that decision, the United States Supreme Court had not decided the Aquilino and Durham cases. The decisions in those cases clarified the situation as to the interrelation between Federal tax liens and state created rights. It would seem under the decisions in those cases that, in cases involving competition between a Federal tax lien and competing claims of subcontractors, if, following the coming into existence of a tax lien, there is an open period during which the owner cannot take credit for the claims of the subcontractors against the contract price, the Federal tax lien attaches at that time ahead of the claim of the subcontractors. Under the Iowa law it would seem that, where more than sixty days have elapsed since the completion of a building and no mechanic's liens of subcontractors are on file, there would be an open period at which time a pre-existing Federal tax lien against the Contractor would attach to the balance due, and that having so attached it would have priority over subcontractors' mechanic's liens subsequently filed. Since the Iowa Supreme Court did not discuss or point out any rights on the part of the subcontractors which would bridge over that open period, it is the view of this Court that the decision of the Iowa Supreme Court, in substance, relates to the priority of a Federal tax lien. In the recent case of United States v. Brosnan, 1960, 363 U.S. 237, at page 240, 80 S.Ct. 1108, at page 1110, 4 L.Ed. 2d 1192, the Court stated:

"Federal tax liens are wholly creatures of federal statute. * * * Consequently, matters directly affecting the nature or operation of

such liens are federal questions, regardless of whether the federal statutory scheme specifically deals with them or not. * * *"

■ In the present case, it is the view of the Court that under the Aquilino and Durham cases the claim of the Government against the balance due on the contract under its tax lien in this case is prior to the claim of Standard under its belatedly filed mechanic's lien. This Court is unable to ascertain any right on the part of Standard which bridged over the gap between December 13, 1955, when the sixty-day period following the completion of the building expired and December 30, 1955, when Standard perfected its mechanic's lien which would prevent the Contractor from demanding and receiving and the Owner paying it the balance due during that gap.

Federal tax liens are the subject of two recent articles in the Drake Law Review. Those articles are Federal Tax Liens: Their Priority and Enforcement, by Harold W. Felton, 10 Drake Law Review 3 (1960), and Title Problems in Connection with Federal Tax Liens, by Jesse E. Marshall, 10 Drake Law Review 28 (1960). The priority of mechanic's liens in Iowa as related to Federal tax liens is discussed in a note in 45 Iowa Law Review 813 (1960).

There is yet to be considered the controversy between the Bank under its assignment and the Government under its tax lien as to the residue or net amount due the Contractor on December 13, 1955, following the expiration of the sixty-day period following the completion of the building, which residue or net amount this Court has determined to be the amount remaining on the contract price after satisfying the claim of the Owner for damages and the Randall lien.

The Government's tax lien in this case came into existence on August 15, 1955, when the Commissioner of Internal Revenue made the tax assessment against the Contractor. The Government filed notice of its lien in the office of the County Recorder of Cerro Gordo County, Iowa, on November 8, 1955. It was stipulated that neither the Owner nor the Bank nor the mechanic's lienholders had any actual knowledge of the Government's tax lien until after November 12, 1955. Therefore, as to the Bank, the Government's tax lien was a secret lien from August 15, 1955, until November 8, 1955. On September 19, 1955, while the Government's lien was still a secret lien, the Bank, as heretofore noted, loaned the Contractor the sum of $3,000 secured by an assignment of all "monies due" the Contractor under its contract with the Owner.

Since the Government's tax lien was prior in time to the assignment made to the Bank, the Government would prima facie be entitled to priority over the Bank as to the balance of the contract price here involved. However, the Bank claims that the Government's lien did not become effective until it was filed of record on November 8, 1955, and therefore it has a prior claim to that balance. That claim requires a consideration of another phase of the law relating to Federal tax liens.

■ The priority statute, Section 6321, Title 26 U.S.C.A., was originally enacted in 1866. 14 Stat. 107 (1866). Subsequently Congress enacted a statute which now appears as Section 6323, Title 26 U.S.C.A., which provides, in part, as follows:

"(a) Invalidity of lien without notice.—Except as otherwise provided in subsection (c), the lien imposed by section 6321 shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the Secretary or his delegate – –

"(1) Under state or territorial laws.—In the office designated by the law of the State or Territory in which the property subject to the lien is situated, whenever the State or Territory has by law designated an office within the State or Terri-

tory for the filing of such notice * * *."

That statute was intended to afford protection to those named in it against secret tax liens in favor of the Government.

Section 335.11, Code of Iowa 1958, I.C.A., provides as follows:

"The notice of a lien for any tax in favor of the government of the United States, or any release of such lien, may be filed and recorded in the office of the county recorder in any county within which the property subject to the lien is situated. Such county recorder shall file, record, and index any such notice of lien or any release of the same without fee."

One of the most cited and discussed cases relating to the coverage of Section 6323(a) is the case of United States v. R. F. Ball Construction Company, Inc., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed. 2d 510. In that case Ball procured a housing project in San Antonio and subcontracted the painting and decorating to Jacobs. On July 21, 1951, Jacobs made application to a bonding company for a performance bond. As security for the protection of the bonding company, Jacobs made an assignment to it of all percentages returned by Ball under the subcontract. The assignment was made as security not only for possible losses growing out of the San Antonio job but also for payment of any indebtedness or liability "whether heretofore or hereafter incurred." On April 4, 1952, Jacobs obtained a similar bond with the same company on a different subcontract in Louisville, Kentucky. On April 30, 1953, the retained percentage on the San Antonio job was determined to be $13,228.15. In May, June and September, 1953, the Government filed tax liens against Jacobs amounting to around $17,000. Thereafter, the bonding company had to pay around $13,000 under its bond covering the Louisville job. The bonding company and the Government both claimed priority as to the retained

percentage on the San Antonio job. The bonding company claimed that it had the status of a "mortgagee, pledgee or purchaser" within the purview of Section 3672 of the Internal Revenue Code of 1939 [currently Sec. 6323(a), Title 26 U.S.C.A.]. The District Court held that the bonding company had priority. R. F. Ball Construction Company v. Jacobs, D.C.1956, 140 F.Supp. 60. In passing upon the contention of the bonding company that it should be classified as a pledgee, that Court stated (at page 64): "In my opinion * * * the Bonding Company in this instance more nearly comes within the classification of a 'mortgagee' under the Texas law * * *." The Court further stated (at page 65):

"The Government argues that if an attachment or other judicial lien is not sufficiently 'choate' or complete 'to defeat a subsequent tax lien' then a mortgage to secure future indebtedness should likewise be inferior to a subsequent tax lien. Congress has in effect stated in Section 3672 that before an attaching, or other similar statutory lienor, could claim priority over the Government, his claim had to ripen into a final judgment. * * * No such qualification was placed by Congress on the contractual lien of a 'mortgagee'. * * * I therefore hold that the Bonding Company under its assignment as collateral security, became a 'mortgagee' within the meaning of 3672 and was, therefore, not affected by the tax liens which were subsequent in time."

On appeal the United States Court of Appeals for the Fifth Circuit affirmed on the opinion of the District Court (239 F.2d 384). The United States Supreme Court, with four Justices dissenting stated (at pages 587, 588 of 355 U.S., at page 443 of 78 S.Ct.):

"The judgment is reversed. The instrument involved being inchoate and unperfected, the provisions of [the predecessor of Section 6323 (a)] § 3672(a), Revenue Act of 1939, 53 Stat. 449, as amended, 53

Stat. 882, 56 Stat. 957, 26 U.S.C.A. § 3672(a), do not apply. See United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53; United States v. City of New Britain, 347 U.S. 81, 86–87, 74 S.Ct. 367, 370–371, 98 L.Ed. 520, * * * ".

The scope and extent of the decision of the United States Supreme Court in that case is not clear. See Note, 43 Minnesota Law Review 755 (1959); Comment, 44 Iowa Law Review 814, 816 (footnote 13) and Heron, Federal Tax Claims Again, or Devastation Revisited, 26 Insurance Counsel Journal 112 (1959). The scope and effect of that decision as to several matters has to be largely surmised or implied from the decision of the District Court which was reversed and from the dissenting opinion written by Mr. Justice Whittaker. The holding of the District Court that the assignee may have had the status of a mortgagee under the Texas law within the provisions of Section 6323(a) was reversed. From that reversal it could be implied that the fact that an assignment may be classified as a mortgage under the state law is not determinative of its status in connection with Section 6323(a). In the dissenting opinion, Mr. Justice Whittaker stated (at pages 593–594 of 355 U.S., 78 S.Ct. at page 445):

"* * * under the law and the facts in this record, the 'assignment' was in legal effect a 'mortgage,' and inasmuch as it antedated the filing of the federal tax liens it was superior to them under the expressed terms of § 3672(a) [Sec. 6323(a), Title 26, U.S.C.A.]. * * * The fact that the assignment was of property to be afterwards acquired did not affect its validity as a 'mortgage,' * * * The questioned assignment conveyed to the surety all sums then due and thereafter to become due * * * as security for the payment * * * [T]he assignment was in legal effect a mortgage * * * perfected on its date, in all respects choate * * * [and

it] antedated * * * the federal tax liens [and hence is] * * * superior to those liens * * * ."

However, the per curiam majority opinion definitely and clearly holds that the assignment there involved did not come within the protection of Section 6323(a). In the case of Aetna Casualty & Surety Company v. Port of New York Authority, D.C.1960, 182 F.Supp. 671, at page 673, the Court, in referring to the Ball case, stated:

"* * * In the Ball case, the plaintiff did not sue as completing 'surety' but as 'assignee,' a status which it contended, under applicable state law as to assignments and mortgages, constituted it a 'mortgagee' under section 3672(a) [Sec. 6323(a), Title 26, U.S.C.A.] * * * and thus entitled to priority. The Supreme Court held the assignment to Ball did not constitute it a 'mortgagee' within the meaning of the code provision. * * * "

In the dissenting opinion of Mr. Justice Harlan in the Aquilino and Durham cases, supra, he stated (at page 516 of 363 U.S. at page 1285 of 80 S.Ct.) that the majority of the Court had sanctioned a result which had been consistently prohibited by previous decisions of the Court. Among the cases cited by Mr. Justice Harlan as prohibiting the result reached in those cases was the Ball case. In the case of Union Central Life Insurance Company v. Peters, 1960, 361 Mich. 283, 105 N.W.2d 196, the Michigan Supreme Court, in a case involving a federal tax lien, stated (at page 200 of 105 N.W.2d):

"* * * In Aquilino and Durham the Supreme Court hints circumstantially that it may be ready to qualify the mentioned test of 'choateness.' The hint, however, is neither loud nor clear * * * ."

While the decision in the Ball case was a 5 to 4 decision and while some are of the view that the holding in that case is, to some extent at least, undermined by the Aquilino and Durham decisions, it

would seem that the holding in the Ball case is still authoritative.

In the Ball case the assignment was made to secure against future liability. In the present case the assignment was made to secure a loan made concurrently with the assignment. In the case of First State Bank of Medford v. United States, D.C.1958, 166 F.Supp. 204, a bank made a loan to a contractor upon the strength of a purported oral assignment of the amounts due under a construction contract. Following the assignment a tax lien came into existence against the contractor. The Government did not file its notice of lien. The bank claimed that it was a mortgagee within the provisions of Section 6323(a). In the litigation between the bank and the Government as to priority as to the balance due, the question arose as to the meaning of the decision in the Ball case. In that connection the Court, after referring to the language in the per curiam opinion in that case, stated (at page 209):

"This language clearly shows that the majority of the Court regarded the assignment as an inchoate and unperfected lien. The Bank here, however, points out that the assignment in the Ball case was made to secure a contingent or future indebtedness and that the assignment under consideration by this Court was given to secure a present and ascertained indebtedness. Admittedly, this is a distinguishing characteristic, but the distinction does not perfect an unperfected lien. * *"

The situation is not changed by the fact that the assignment is given for full present consideration. Arthur Company v. Chicago Paints, Inc., D.C.1959, 175 F.Supp. 50.

It is the holding of this Court that the Bank did not have the status of a "mortgagee" within the provisions of Section 6323(a).

It is the claim of the Bank that it had the status of a "purchaser" within the provisions of Section 6323(a). In the case of United States v. Scovil, 1954, 348 U.S. 218, at page 221, 75 S.Ct. 244, at page 247, 99 L.Ed. 271, the Court stated:

" * * * A purchaser within the meaning of § 3672 [Section 6323 (a)] usually means one who acquires title for a valuable consideration in the manner of vendor and vendee. * * *"

If a transaction is a security transaction rather than a sale, the parties have the relation of lender and borrower rather than vendor and vendee. United States v. Chapman, 10 Cir., 1960, 281 F.2d 862, 868. See also Arthur Company v. Chicago Paints, Inc., D.C.1959, 175 F.Supp. 50, 53.

It seems clear that in the present case the transaction between the Bank and the Contractor was a security transaction and that the Bank did not have the status of a "purchaser" within the provisions of Section 6323(a).

It is the claim of the Bank that it had the status of a "pledgee" within the provisions of Section 6323(a).

In the note executed to the Bank it is stated that the maker of the note had deposited therewith and "pledged as collateral security to the holder thereof for the payment of the above note, the following property, to-wit: Assignment Eli Colby Co. Contract." The assignment was as follows:

"Assignment

"For Value Received, The Iowa Builders, Inc., by Carl P. Rinard, President, does hereby transfer and assign all its right, title and interest in and to all monies due the Iowa Builders, Inc., by virtue of the performance of a certain contract dated June 29, 1955, by and between the Eli Colby Company of Hanlontown, Iowa, and the Iowa Builders, Inc. covering the erection of a Stran-Steel Quonset Type A Building erected at Lake Mills, Iowa, to the United Home Bank & Trust Co., a banking corporation, of Mason City, Iowa, as collateral and se-

curity for monies advanced this 19th day of September, A.D.1955, to the Iowa Builders, Inc.

"Dated at Mason City, Iowa this 19th day of September, A.D.1955.

> "Iowa Builders, Inc.
> By /s/ Carl P. Rinard
> Carl P. Rinard, President

"Notice of the Assignment of said Contract by and between the Iowa Builders, Inc. and the Eli Colby Company is hereby accepted this 26th day of September, A.D.1955.

> "Eli Colby Company
> By /s/ Eli F. Colby.
> Partner."

 At the time the Contractor made the assignment to the Bank, it had not completed the construction of the building under its contract. The assignment had to do with monies that would become due in the future under an executory contract. The right of the Contractor to those monies under the contract constituted a chose in action. The legal effect of a pledge is to give the pledgee a lien upon the property pledged. Therefore, under the pledge theory, what the Bank obtained by the assignment was a lien upon a chose in action. It would have a lien upon that chose in action by virtue of instruments executed by the Contractor to it without resort to the pledge theory. Whether the Bank be regarded as having a lien on the chose in action under the pledge theory or some other theory, its lien would still have to meet the requirements prescribed by the United States Supreme Court in the Ball case, i. e., its lien must have been choate and perfected in order to come within the provisions of Section 6323(a). The lien of the Bank under the instruments executed to it by the Contractor would not become choate or perfected by regarding those instruments as having resulted in a pledge of the chose in action.

It is the holding of the Court that the Bank does not have the status of a pledgee within the provisions of Section 6323(a).

It was heretofore noted that the Government's tax lien on the chose in action was prior in time to the lien of the Bank on the same chose in action. Therefore, in order for the Bank to have priority over the Government under its tax lien as to the balance of the contract price here involved, it had to come within the provisions of Section 6323(a).

It is the holding of the Court that the Bank does not come within the provisions of Section 6323(a) and that the Government under its tax lien has priority as to the balance of the contract price here involved.

The Bank asserts, and correctly so, that its transaction with the Contractor was an ordinary and normal bank loan transaction. It further asserts that if the Government is given priority by virtue of its tax lien it has been deprived of all the security given it in connection with that transaction by a secret lien. It further asserts that it was the intention of Congress in enacting Section 6323(a) to give those engaged in normal and usual security transactions protection against secret tax liens. However, it seems clear that, as presently interpreted by the United States Supreme Court, Section 6323(a) does not afford protection to the Bank in this case.

The foregoing shall constitute the Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

It is hereby ordered that judgment shall be entered in accordance with these Findings and Conclusions.